In re Carroll Byron POWELL and Phyllis Roberta Powell, Debtors.

**FIRST CITY BANK–CENTRAL PARK, Plaintiff,**

v.

**Carroll Byron POWELL and Phyllis Roberta Powell, Defendants.**

Bankruptcy No. 5–86–02183.
Adv. No. 87–5069.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

June 30, 1988.

Kathryn D. Burgchardt, Law Offices of H. Jack Pytel, Jr. and Associates, P.C., San Antonio, Tex., for defendants.

Thomas S. Harmon, Douglas & Elms, Inc., San Antonio, Tex., for plaintiff.

Randolph N. Osherow, San Antonio, Tex., trustee.

## MEMORANDUM OPINION AND ORDER

LEIF M. CLARK, Bankruptcy Judge.

Carroll Byron Powell was in the jewelry business. He owned 90% of two compa-

nies, Fine Jewelry and Fine Diamond. On December 16, 1986, both he and his companies filed bankruptcy under Chapter 7.

Powell and his companies had been long-time customers of Central Park Bank and had a credit line secured by inventory, equipment, and receivables. This bank was acquired by First City Bancorporation sometime in 1984. After that acquisition, his credit line went into a collection mode, with no new funds being advanced from the bank. Thus, his sole sources of working capital were the proceeds generated from the jewelry business and small loans he obtained from another bank, Metropolitan Bank.

A downturn in the jewelry business evidently led to a similar downturn in the fortunes of Fine Jewelry and Fine Diamond. The balance sheets for Fine Jewelry (his retail operation) prepared for fiscal year-end March 31, 1985 reflected an inventory value of $605,775. The income statement showed purchases of $197,932. The income statement for that period also indicated an "inventory change" drop of $27,-033.[1] In March 1986, the balance sheet showed inventory of just $435,595, yet the income statement reflected inventory purchases of $358,203. Inventory change for 1986 was shown to have fallen by $233,-654.[2]

When the bank received the 1986 financial statements, showing an "adjustment" to retained earnings on the balance sheet of over $220,000, it responded predictably.[3] About this same time, the insurance on the collateral was cancelled, causing the bank

---

**1.** It is difficult to tell what "inventory change" means, though it seems to relate to the net change in year-end inventory from the previous year.

**2.** These financial statements were prepared by Nathanson & Fairall, Inc., whose letterhead indicates that the principals were "enrolled to practice before the Internal Revenue Service" and "specializing in data processing services." They are evidently not certified public accountants. There is no indication that the financial statements were prepared in accordance with

generally accepted accounting principles. The inventory thus may have been reported at cost, market or retail. The tax returns reflect a much lower number for cost of goods sold than do the financial statements, suggesting that the numbers ·in the financial statements are grossly inflated. The cover letter from Nathanson & Fairall represents that "our preparation is limited to presenting in the form of financial statements information that is the representation of management." Even so, the "why" for the dramatic *change* in inventory is left unexplained.

**3.** The financial statement bore no explanation for this adjustment. If the inventory value was

still greater concern. Powell refused to get replacement insurance, refused to let the bank inventory the jewelry, and refused to cooperate when the bank decided to repossess the jewelry (which was of course pledged on the note). By the time the bank had obtained a writ of sequestration, the condition of the remaining jewelry was extremely poor. In fact, according to Powell himself, much of the remaining inventory consisted of "breakouts," the residue of jewelry inventory that could not be sold.

The evidence is not clear precisely what happened to the jewelry inventory of Fine Jewelry. The bank, of course, is convinced either that Powell made off with the last of the inventory, or that Powell falsely overstated the value of the jewelry in the first place, to induce the continued renewal of credit.[4] Powell responds that he conducted numerous "half-off" sales, and that, because of the lack of a line of credit, he was unable to replenish his stock, so that the value of his diminishing inventory itself diminished over time as the best pieces were sold.[5] He also maintains he was using sale proceeds to pay down the bank debt, but no significant reduction in accounts payable was reflected in the 1986 financial statement.

Other witnesses called at trial confirmed that the quality of the inventory deteriorated substantially, indicating that, one way or another, the best inventory was somehow sold or disposed of. The schedules filed for Fine Jewelry reflect wholesale values placed on the jewelry at inventories purportedly conducted by Powell in 1985 and 1986 (these inventories were not produced by Powell at trial). The drop in values reflected in these reported inventories is considerably less than that shown in the financial statements furnished the bank, but so also are the reported values themselves.[6]

Sales tax returns tell still another story. Fine Jewelry reported total sales of $63,018 for the first quarter of 1985, $46,272 for the second quarter, $67,252 for the third quarter, and $77,461 for the fourth quarter. The first quarter of 1986 generated total sales of $45,433.[7] The one-year period covered by the 1986 financial statement thus had total sales of $236,416 (a retail figure), but the income statement reported purchases of $358,203 (a cost figure) for the same period. By the time of the bankruptcy, Fine Jewelry reported no inventory at all, as the bank had repossessed and sold what was left. The Bank netted less than $20,000 from the sale.[8]

■ These conflicting financial reports, absent explanation, lead the Court to the fair presumption that Fine Jewelry or its principal, C.B. Powell, absconded with some of the inventory. The tax returns report an increase in inventory from 1985 to 1986 yet the financial statements reflect a dramatic decrease or writedown. The sales receipts show substantial sales for 1985–86, but nothing which would support the inventory purchases reflected for that period. The Court is left with the nagging suspicion that Powell succumbed to temptation and diverted some of his inventory. At the very least, the evidence created a serious question about a deficiency of assets. Powell was obligated to answer the

---

written down, no reason was given for such a dramatic drop.

4. Fine Jewelry maintained four notes, which it "rolled" by paying interest upon maturity. The principal on these notes was being reduced as well. Powell both owned and operated Fine Jewelry, and had guaranteed the debts.

5. This explanation does not fully account for the dramatic inventory writedown, nor does it explain the equally dramatic *increase* in inventory purchases reflected in the 1986 income statement. Powell does not explain where Fine Jewelry got the money to pay for these purchases,

without a line of credit and in a soft market for retail jewelry.

6. In 1985, Powell valued his inventory at $272,427. A year later, the 1986 inventory purportedly reflected a value of $232,787, a drop of approximately $40,000.

7. Originally, $70,304 was filled in. This number was crossed out and the new number inserted.

8. Powell maintains the bank could have received more had it let him liquidate the collateral for them. The trust level between he and

questions raised by this evidence. 11 U.S.C. § 727(a)(5).[9] This he failed to do.

Powell was also unable to produce invoices or other records of actual sales to explain the changes in Fine Jewelry's inventory. He argued that Nathanson had the materials. The accountant, however, was never called as a witness, nor did Powell take steps to retrieve this documentation from Nathanson, despite the bank's discovery request. Were this information exculpatory, it seems that either Powell would have retrieved it or would have called Nathanson as a witness.[10] This failure leads the court to believe that, at the very least, Powell failed to maintain or produce records of Fine Jewelry to satisfactorily explain the marked change in inventory reflected in the financial statements and failed to demonstrate that this failure was justified under the circumstances. 11 U.S.C. § 727(a)(3).[11] The fact that the bankruptcy schedules paint a far more sedate picture of Fine Jewelry's business activities only raises more questions. The schedules, of course, are self-serving hearsay in the first event. Why do they differ so drastically from the financial statements, upon which Powell knew the bank routinely relied?

■ Section 727(a)(7) makes an individual debtor liable to the extent he or she engages in conduct on behalf of an insider which violates any of the first six subsections of Section 727(a).[12] Powell, as both 90% owner, officer, operator and prime employer of Fine Jewelry, was the human person who was the actor and decisionmaker for the corporate person, Fine Jewelry. Fine Jewelry is an insider under the Bankruptcy Code. 11 U.S.C. § 101(30). Thus, if Fine Jewelry can be said to have violated any of the provisions of Section 727(a), it did so by and through C.B. Powell. The failure of Fine Jewelry to either account for the deterioration of its inventory or preserve its records so that that determination could be made must ultimately be the responsibility of its owner and operator, C.B. Powell. For this reason, the Court concludes that Fine Jewelry through its principal, C.B. Powell, has run afoul of subsections (a)(3) and (a)(5) of Section 727, thereby rendering Powell vulnerable under Section 727(a)(7). *In re Bowie*, 80 B.R. 99, 100 (Bankr.N.D.Ohio 1987); *In re Tackett*, 67 B.R. 354 (Bankr.E.D.Tenn.1986); *Matter of Davison*, 73 B.R. 726, 730 (Bankr.W.D. Mo.1987). Powell's discharge will therefore be denied.

The debtor's unexplained (and unreported) disposition of personal property further supports the conclusion that Mr. Powell's discharge be denied. *Matter of Davison, supra; In re Losinski*, 80 B.R. 464, 474 (Bankr.D.Minn.1987). 11 U.S.C.

the bank was too low for that to happen however. All agree that what was left to sell was the dregs of the business.

9. Section 727(a)(5) reads as follows:
(a) The court shall grant the debtor a discharge unless,—
(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;
11 U.S.C. § 727(a)(5).

10. The fair presumption is that an accountant would either save his client's workpapers or return them to his client. Where evidence which could be exculpatory is not produced by the party to be exculpated, the presumption is that the evidence would be incriminating, and may therefore be evidence that the party in question is guilty. *See In re Anderson Oaks* (Phase I) *Limited Partnership*, 77 B.R. 108, 111 n. 1 (Bankr.W.D.Tex.1987).

11. Section 727(a)(3) reads as follows:
(a) The court shall grant the debtor a discharge, unless,—
(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
11 U.S.C. § 727(a)(3).

12. Section 727(a)(7) reads as follows:
(a) The court shall grant the debtor a discharge, unless,—
(7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider;

§ 727(a)(5). For 1985 and 1986, Powell maintained that his household furnishings were worth $75,000 and his personal jewelry another $65,000 to $70,000. By the time of filing, less than nine months after the 1986 personal financial statement, all of it was gone, yet the debtor had virtually no cash to show for it. The debtor maintains he sold the furniture at garage sales, and sold the jewelry privately to various people, most of whom he did not know. The debtor did not corroborate these explanations with others' testimony or with documentation. The Court finds these explanations strained, especially insofar as Powell maintains he lived off the proceeds of the sale of these items. Again, either the furniture and jewelry were worth what Powell claimed on his financial statements (and he raised over $100,000 in just nine months, then spent it all) or Powell's financial statements were so overstated that they were intentionally meant to mislead the bank. Neither conclusion aids Powell's cause.

However, this Court need not determine whether the mysterious liquidation of Powell's personalty constitutes grounds for a denial of discharge, as evidence associated with Fine Jewelry's financial affairs was sufficient to reach that conclusion.

Moreover, the grounds for denial of discharge have been proven by clear and convincing evidence, though this court is not satisfied that such a heightened evidentiary standard is either mandated by the statute or appropriate to achieve the purposes of the Bankruptcy Code. The *raison d'etre* for the heightened standard of proof, according to the numerous opinions which have relied on it, is that the public policy underlying the Code favors a fresh start for the *honest* debtor. *Maynard v. Elliott*, 283 U.S. 273, 277, 51 S.Ct. 390, 392, 75 L.Ed. 1028 (1931); *Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 113–14, 27 L.Ed.2d 124 (1970). Yet it is that very honesty which is called into question in dischargeability and discharge cases. The higher standard of proof tends to presume the very issue in question, namely, the debtor's honesty. If we determine that a debtor has been less than candid with the bankruptcy court and his creditors, we should be justified in concluding that our subject is not the "honest debtor" much ballyhooed in legislative history and case law. *See In re Gans*, 75 B.R. 474, 481 (Bankr.S.D.N.Y. 1987); *Matter of Newmark*, 20 B.R. 842, 852 (Bankr.E.D.N.Y.1982). The presumption of honesty and the rule of strict construction which flow therefrom should be dropped in favor of a more measured and even-handed review of the evidence.[13]

■ Mrs. Powell, unlike her husband, took no part in the conduct of which her husband is guilty. Even though she signed the individual schedules, she did not sign the corporate schedules. Even though she apparently participated in the sale of personal jewelry and furniture (at garage sales, according to the debtor), personalty valued in the financial statements at $135,000 or so, all parties agree that Mrs. Powell was and is a housewife who left business affairs to her husband. The evidence does not warrant tarring her with the same brush. She will receive her discharge.[14]

The Court does not need to decide whether grounds have been shown to find the Bank's debt nondischargeable under Section 523(a)(2), (4) or (6).[15] No findings are therefore made on those counts.

11 U.S.C. § 727(a)(7).

13. To the extent that the "clear and convincing" standard is premised on those indulgences in favor of the debtor, the standard itself is also suspect. In addition, the heightened standard casts doubt on a bankruptcy court's ability to give collateral estoppel effect to judgments rendered in other forums using lower standards of proof. These questions are reserved for another day, however, as the clear and convincing evidentiary standard is met in this case. *See Combs v. Richardson*, 838 F.2d 112, 116–17 (4th Cir.1988).

14. This conclusion is consistent with Section 302 of the Code, which, though it permits joint cases, treats them as two independent estates, jointly administered. 11 U.S.C. § 303(b); Bankr. R. 1015.

15. It does not appear that the bank's reliance on the statements in question was reasonable, so nondischargeability under 11 U.S.C. § 523(a)(2)(B) is highly suspect. *In re Picou*, 81 B.R. 152 (Bankr.S.D.Fla.1988); *In re Anzman*, 73 B.R. 156 (Bankr.D.Colo.1986). There is also some question whether the bank even has standing to complain of the dischargeability of Mr.

It is therefore ORDERED that a discharge be and is hereby DENIED to Carroll Byron Powell. A discharge is GRANTED to Phyllis Roberta Powell. Each party shall bear its respective costs as incurred. The determination under Section 727 renders the Bank's claim under Section 523 MOOT.

Powell's guaranty liability based on the conduct of Fine Jewelry. *See Ford Motor Credit Co. v. Owen,* 807 F.2d 1556 (11th Cir.1987). The evidence in support of the remaining grounds was not clear and convincing in any event.