**In re Sherrard Joseph HUBBARD, Jr. and Cathy Hubbard, Debtor(s).**

**POOLQUIP–McNEME, INC., Plaintiff–Creditor,**

**v.**

**Sherrard Joseph HUBBARD, Jr. and Cathy Hubbard, Defendants–Debtors.**

**Bankruptcy No. 1–86–00063. Adv. No. 1–86–0097.**

United States Bankruptcy Court, W.D. Texas, Austin Division.

Feb. 24, 1989.

Michael E. Deitch, Austin, Tex., for defendants-debtors.

Steven D. Ross, Greif & Ross, Benjamin H. Hathaway, Hilgers & Watkins, Austin, Tex., for plaintiff-creditor.

## MEMORANDUM OPINION DENYING DISCHARGE PURSUANT TO § 727

LARRY E. KELLY, Chief Judge.

This adversary proceeding was initiated by Poolquip–McNeme, Inc. ("Plaintiff"), an unsecured creditor, on May 30, 1986. Plaintiff asks that the Court deny the discharge of Sherrard Joseph Hubbard and Cathy Hubbard ("Debtors") on several of the grounds enumerated in 11 U.S.C. § 727. The Court finds that it has jurisdiction as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J). Having considered the pleadings and the evidence presented on November 15 and 16, 1988, the Court makes the following Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052.

### BACKGROUND

Debtors herein are a husband and wife who filed a Chapter 7 petition seeking relief from their individual debts on January 24, 1986 ("Hubbards Chapter 7"). Debtors were at the time of the events upon which the objection to discharge is based, the president (Joe Hubbard), vice-president (Cathy Hubbard), 100% shareholders, manager (Joe Hubbard) and bookkeeper (Cathy Hubbard) of a corporation known as Highland Pools and Service, Inc. ("Highland Pools"). Prior to its incorporation in 1982, Highland Pools had been operated as a pool maintenance business in the form of a sole proprietorship by the Hubbards since 1975. Highland Pools filed a petition for reorganization and protection from its creditors on August 29, 1985 ("Highland Pools Chapter 11"). Pursuant to a Motion to Convert filed by the Debtor's attorney the Highland Pools Chapter 11 was converted to a Chapter 7 case ("Highland Pools Chapter 7") on February 21, 1986. The Highland Pools Chapter 7 was dismissed on June 20, 1986 on a Motion to Dismiss filed by the Debtors' attorney only eleven days after he had filed the Motion to Convert. The evidence is convincing that the Motion to Convert was a mistake. The decision had been made by the Debtors, after discussion with their attorney, to dismiss the Highland Pools Chapter 11 since it appeared that

reorganization (the goal of Chapter 11) was impossible and discharge (one of two goals of Chapter 7 [1]) was not available to a corporate debtor.[2] The Debtors acted for all practical purposes as if the Highland Pools Chapter 7 case never existed and as if the Order of Conversion signed February 21, 1986 had been an Order of Dismissal. This fact alone explains several of the Debtors' actions during the Spring of 1986 which are complained of by Plaintiff.

A great deal of evidence has been presented in this case. Plaintiff has painstakingly documented many, and probably most, of Debtors' transgressions during these three (technically only two, since the Highland Pools Chapter 11 and Highland Pools Chapter 7 are actually one case, but discussed as if separate for clarity here) related bankruptcies. The wealth of evidence and the fact that complaint is brought under several sections of § 727 make this a good case in which to attempt a definition of the standards expected of a debtor who seeks discharge in bankruptcy. After much consideration of how to present the facts in this case (e.g., chronologically, by Code subsection allegedly violated, by each separate case), the Court has decided to list those facts upon which it relies to deny discharge (arranged where possible by Code subsection violated) followed by those facts alleged as ground for denial of discharge but successfully explained to the satisfaction of the Court by the Debtors.

## ISSUES PRESENTED

Though a detailed relation of the facts to the law will be delayed to the conclusions of law recited below, a statement of the elements of each alleged ground for denial of discharge is appropriate at this point.

■ 1. Plaintiff alleges that, in violation of 11 U.S.C. § 727(a)(2) the Debtors, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under title 11, have transferred or concealed (A) property of the Debtor within one year before the filing of the petition or (B) property of the estate after the filing of the petition. The intent to hinder or delay or defraud must be an *actual* rather than constructive intent. *In re Olivier,* 819 F.2d 550 (5th Cir.1987); *In re Reed,* 700 F.2d 986 (5th Cir.1983). Actual intent may be inferred from a consideration of all the circumstances. *In re Reed,* 700 F.2d 986, 991 (5th Cir.1983) *citing Farmers Co-op Ass'n. v. Strunk,* 671 F.2d 391, 395 (10th Cir.1982). Intent is the most difficult element of a § 727 violation to prove and is the key to decision in this case.

■ 2. Plaintiff alleges that, in violation of 11 U.S.C. § 727(a)(3), the Debtors have failed to keep and preserve recorded information from which the debtors' financial condition or business transactions might be ascertained. Plaintiff further alleges this failure is not justified under all the circumstances of this case. Under this subsection the Debtor is required "to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate." *Koufman v. Sheinwald,* 83 F.2d 977 (1st Cir.1936). There is no intent requirement under this subsection but only a reasonableness requirement. In *In re Williams,* 62 B.R. 590 (Bankr.N.D.Tex.1986) *citing Rhoades v. Wikle,* 453 F.2d 51, 53 (9th Cir.1971) the standard is stated as follows:

("Section 14(c)(2) [now 11 U.S.C. § 727(a)(3) ] does not prescribe a rigid standard of perfection in keeping records or making business accounts. It simply requires that the bankrupt present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past. Each case rests of necessity on its own facts, and upon consideration of the bankrupt's specific business venture and the reasonable re-

---

**1.** See *Burlingame v. Crouse,* 228 U.S. 459, 473, 33 S.Ct. 564, 568, 57 L.Ed. 920 (1913) "[I]t is the twofold purpose of the Bankruptcy Act to convert the estate of the bankrupts into cash and distribute it among creditors and then to give the bankrupt a fresh start."

**2.** 11 U.S.C. § 727(a)(1).

quirement of book and record keeping in that particular field.").

A complaint under § 727(a)(3) is seldom unaccompanied by a related complaint under § 727(a)(5) (failure to explain loss of assets). This case is no exception.

■ 3. Plaintiff next alleges that, in violation of § 727(a)(4), Debtors have knowingly and fraudulently made false oath. A false statement objectionable under § 727(a)(4) must have been made under oath, the debtor must have known when he made the statement that it was not true and must thereby have intended to defraud. *Humphries v. Nalley*, 269 F. 607 (5th Cir.1920). As with § 727(a)(2), an objecting creditor must prove intent, but again this intent may be inferred from circumstantial evidence. *Sinclair v. Butt*, 284 F. 568 (8th Cir.1922); *In re Kessler*, 51 B.R. 895 (Bankr.D.Kan.1985). Because the Debtor has an affirmative duty to list all assets and fully answer the questions in the petition, *In re Morris*, 58 B.R. 422 (Bankr.N.D.Tex.1986), an omission from the schedules may qualify as a false oath. Bankruptcy courts have not imposed strict liability under § 727(a)(4) for omissions from schedules. *In re MacDonald*, 50 B.R. 255, 259 (Bankr.N.D.Ga.1985) ("Discharge denial of § 727(a)(4) cannot be imposed where the false statement was created by a simple mistake or inadvertence.") However, because a court may infer knowledge and fraudulent intent from the existence of a sworn false statement, once a sworn statement is shown to be false, the burden to prove that the statement or omission was an honest mistake shifts to the debtor. *In re Mascolo*, 505 F.2d 274 (1st Cir.1974). In addition, discharge will not be denied under § 727(a)(4) unless the false statement relates to a material matter. *Chalik v. Moorefield*, 748 F.2d 616 (11th Cir.1984).

■ 4. Plaintiff further alleges that, in violation of § 727(a)(5) Debtors have been unable to satisfactorily explain certain losses of assets. The element of intent necessary under several other subsections of § 727 need not be proved to justify denial of discharge under § 727(a)(5). COLLIER ON BANKRUPTCY (15th ed. Volume 4 ¶ 727.08); *In re Pietri*, 59 B.R. 62 (Bankr. M.D.La.1986) ("This finding by itself, would be sufficient to deny discharge under § 727(a)(5). There is no intent or scienter requirement in this provision of the Code."). It does appear however that an intent-to-defraud test is indirectly applied in § 727(a)(5) cases through a court's decision of which explanations it finds satisfactory. Once the objecting creditor has made a prima facie case of loss of assets, the burden to satisfactorily explain this loss shifts to the debtor. *In re Reed*, 700 F.2d 986 (5th Cir.1983). The Reed court elaborates on what explanation would be satisfactory:

> The word satisfactorily ... may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation—he believes what the bankrupts say with reference to the disappearance or shortage. He is satisfied. He no longer wonders. He is contented. *In re Reed*, 700 F.2d 986 (5th Cir.1983) *citing with approval In re Shapiro & Ornish*, 37 F.2d 403 (N.D. Tex.1929), aff'd 37 F.2d 407 (5th Cir. 1930).

5. Finally, Plaintiff complains under § 727(a)(7) that the debtor has committed an act specified in paragraph (2), (3), (4), (5) or (6) of this subsection, "on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider." It is this section under which the Debtors, in their individual Chapter 7 case, can be held accountable for acts they, or Highland Pools through them, performed in the Highland Pools bankruptcy case. *See In re Powell*, 88 B.R. 114 (Bankr.W.D. Tex.1988).

As promised, I first set out below the facts which justify denial of discharge in this case followed by facts alleged by the Plaintiff to justify denial of discharge but found by the Court to fall short of the standards outlined above. The great ef-

forts at proof by the Plaintiff in this case have produced so much evidence, and the Defendants have produced such a volume of explanations and excuses that one is grateful that full-fledged objections to discharge are seldom pursued.

■ As an ultimate factual inference, I find that the Debtor's, Joe and Cathy Hubbard, transferred or concealed assets, with actual intent to hinder or delay creditors, by the way they handled the closing of Highland Pools in or about January 1986, as well as by the way they handled the receipt of funds from the settlement of a personal injury case and subsequently "loaned" $15,000.00 of those proceeds to Mr. Richard A. Warren. In support of this I make the following Findings of Facts:

## FINDINGS OF FACT JUSTIFYING DENIAL OF DISCHARGE UNDER CODE § 727(a)(2)

1. Debtors were the sole shareholders, officers, directors and operators of Highland Pools at all times pertinent to this proceeding. They began the business as a sole proprietorship in 1975 and incorporated it in 1982.

2. Highland Pools was a pool maintenance business until about 1985. In that year Highland Pools had approximately 35 employees and had expanded its operations to include pool construction.

3. Cathy Hubbard kept books for Highland Pools until 1985 at which time the company hired a certified public accountant. The evidence indicates that the Hubbards had no advanced business education and thought primarily in terms of cashflow. They had little appreciation for the fine points of accrual accounting. Until 1985 they both believed their business was doing well; all employees were busy and the money was "pouring in."

4. The CPA spent much of 1985 auditing Highland Pool's records from 1984. By July 1985 he caught up with current bookkeeping and advised the Hubbards that business was not going as well as they believed. He further advised the Hubbards that they needed $250,000.00 to meet current cash needs. One creditor, for example, who was not being paid as required was the Internal Revenue Service for employee withholding taxes in the approximate amount of $80,000.00.

5. The Hubbards then met with a bankruptcy attorney. They elected to file a Chapter 11 reorganization for Highland Pools in August 1985. Almost immediately after filing, the Hubbards recognized that reorganization would not work. The business of Highland Pools began to be scaled back immediately.

6. Highland Pools was primarily involved in pool maintenance and construction, but it also operated a "division" under the assumed name of "Triple A Plastering" ("Triple A"). The Hubbards negotiated a sale of Triple A to Ms. Reba Zuniaga for $4,000.00 plus a 10% commission to be paid on any sales which were referred to her. This is reflected in Plaintiff's Exhibit 130 (hereafter "Px. __"). This sale was not disclosed to or approved by the Bankruptcy Court.

7. Testimony from the Hubbards along with Exhibit 130 indicate that the sale was negotiated during the Highland Pools bankruptcy in or about September 1985. The Debtors recognized the need for court approval and did advise their attorney of the agreement. However no signed copy of any contract was given to their attorney, he never filed any document requesting court approval, and court approval was in fact not obtained. However the assets were transferred along with Triple A's phone number, and at least two commission checks were received by Highland during its bankruptcy. While failure to obtain court approval of sales of assets may not by itself always be sufficient to deny discharge, the question of whether the transfer was for fair value and whether the value received was used for the benefit of creditors is still before the Court. That question would have been answered at the time of the transaction if proper procedures pursuant to Code § 363 had been followed. The Debtors' cavalier attitude toward the requirement of Court approval of sales probably reflects a lack of under-

standing that notice of the sale at the time it is proposed allows creditors to protect their interests by timely objection and also protects debtors from later accusations of fraudulent transfers. It is the Debtor's attorney's job in all cases to instill this understanding.

8. As business worsened in the Fall months of 1985 the Hubbards concluded that the Chapter 11 for Highland Pools was a failure. In December they began to consider a personal bankruptcy because of exposure from the Internal Revenue Service liability as well as from various personal guarantees they had executed in favor of Highland Pools' various creditors. The decisions to close Highland Pools and to file personal bankruptcy were both made in December 1985.

9. The Debtors decided to dismiss rather than convert the Highland Pools Chapter 11 case. Through inadvertence their attorney filed a Motion to Convert the case on February 13, 1986, which was granted by Court Order of February 21, 1986. This mistake was subsequently discovered, and a Motion to Dismiss was filed on or about February 24, 1986, but was not granted until some time in June, 1986. (Px. 151, 152).

10. During December, 1985 and early 1986 the individual Debtors had discussions with the bankruptcy attorney for Highland Pools about filing their own personal bankruptcy. On our about January 7, 1986 the Hubbards received a settlement from a personal injury suit in which Joe Hubbard was the plaintiff. The net recovery to Joe Hubbard was $24,000.00. (Px. 5, 9). This fact was disclosed to the attorney for Highland Pools who ultimately ended up being the counsel in their individual bankruptcy case as well. The attorney informed the Hubbards that cash was a non-exempt asset and would have to be disclosed and turned over to a Trustee if they still retained it at the time their bankruptcy case was filed.

11. The Hubbards inquired whether the cash could be used to start a new business. They were informed that any ownership interest by the Hubbards in a new business enterprise would also have to be disclosed and turned over to the bankruptcy Trustee as a non-exempt asset.

12. The Hubbards then inquired about their right to use the funds to repay their creditors. The attorney informed them that it was allowable to repay creditors but they should be aware that the Trustee could seek to recover the payments under certain circumstances.

13. The Hubbards used approximately $5,500.00 of the personal injury settlement proceeds to pay various creditors including $2,100.00 to Joe Hubbard's stepmother and various other sums to other unsecured creditors such as MasterCard, Visa, Stelfox Jewelers, Spiegels, Louis Shanks and Sears. (Px. 10–17).

14. None of the $5,500.00 in payments to creditors was disclosed on the individual Debtors' original schedules or statement of affairs when they filed their bankruptcy. (Px. 110, 111).

15. After having these discussions about the use of the settlement proceeds with their attorney, the Hubbards then had discussions with Richard A. Warren about his starting up a new pool business, acquiring the remaining assets of Highland Pools, and Joe and Kathy Hubbard "going to work" for him.

16. The Hubbards took $15,000.00 of the personal injury proceeds and transferred them to Richard A. Warren in January 1986 immediately prior to filing this Chapter 7 bankruptcy.

17. Richard A. Warren was a friend and a longtime employee of Highland Pools. He initially began work for the Hubbards in April, 1977. He was a service employee and worked his way up to being "service manager". During his employment with Highland Pools he had no involvement with the financial affairs of the company or of its books and records.

18. The Debtors testified that the $15,000.00 was a "loan" to allow Mr. Warren to start up his new company and that it was not to be considered as an investment. The Debtors disavow any ownership interest, legal or equitable, in Richard A. Warren's new business enterprise which he claims to

be a sole proprietorship doing business as All Pools Service and Repairs ("All Pools").

19. The $15,000.00 "loan" is not documented. There is no written agreement. The parties testified that there was no discussion of interest rate or date by which the loan was to be paid in whole or in part.

20. The personal injury settlement monies were initially deposited in the Hubbard's personal bank account. Withdrawals were made from this account and transferred to Richard A. Warren to "effectuate the loan" as follows (Px. 20, 21, 22):

a. On January 10, 1986 $5,000.00 cash was taken out by means of a check written to "cash", signed by Kathy Hubbard. No mention is made on the check of it being a loan to Richard A. Warren and his name does not appear on the check;

b. On January 14, 1986, a cashier's check for $6,000.00 was made payable to All Pools Service;

c. On January 21, 1986, a cashier's check for $4,000.00 was made payable to All Pools Service;

d. All $15,000.00 was deposited into a newly opened account for All Pools Service and Repair on January 23, 1986, with Kathy Hubbard opening the account and appearing along with Richard Warren as an authorized signatory (Plaintiff's Exhibit 34, 35);

e. The Hubbards filed their personal Chapter 7 bankruptcy on January 24, 1986; and

f. Business operations of Highland Pools were closed down on January 31, 1986.

21. In addition to the above chronology of events evidencing the "loan", the Hubbards filed schedules and statements of affairs as required by Code § 521(1) and Bankruptcy Rule 1007 in February 1986. The "loan" to Richard A. Warren is not disclosed anywhere nor are the transfers to Joe Hubbard's stepmother or the payments to other unsecured creditors. All the payments were made in January 1986 immediately prior to the filing of bankruptcy.

22. In addition, the personal injury settlement is disclosed in the Hubbards schedules as being for only $10,000.00 and not

the $35,000.00 gross or $24,000.00 net recovery which they actually received. Although Debtors amended their statement of affairs in May 1986 to indicate the proper amount received on the personal injury settlement and to indicate a $2,000.00 payment to "father" (probably should have said stepmother), none of the other payments to unsecured creditors are shown. Debtors also amended their schedules in May 1986 to reflect the $15,000.00 as "unsigned agreement with Richard Warren, 100% owner of All Pools, to repay funds *invested.*" (emphasis added).

23. All Pools, upon receiving the $15,-000.00 "loan" agreed to hire Joe Hubbard and wife, Kathy Hubbard at the same salaries they had with Highland Pools.

24. All Pools Service took over all or substantially all of the remaining furniture, fixtures, equipment and inventory of Highland Pools for the agreed upon sum of $1,610.00. This sum was paid in February, 1986, utilizing some of the $15,000.00 of "loan" proceeds. All Pools also received the customer list of Highland Pools. The sale was not approved by the Bankruptcy Court nor disclosed to the Bankruptcy Court in Highland Pools case. (Px. 23).

25. While with Highland Pools, Joe Hubbard had obtained key man insurance. Highland Pools paid the premium on the insurance until it was closed down January 31, 1986. All Pools paid the premium thereafter on Joe Hubbard's key man insurance. No key man insurance was obtained for Richard A. Warren. (Px. 46).

26. In or about August, 1985 Highland Pools operated its business at four separate locations. One of those locations was at 9906D Gray Blvd. in Austin, Texas and was leased from E.H. Becker, Jr. In January, 1986 this lease agreement was "taken over" by Joe Hubbard individually, a new lease agreement was executed (Px. 8) and then transferred or assigned by Joe Hubbard to All Pools. All of the furniture, fixtures, equipment and inventory of Highland Pools not otherwise sold to All Pools remains in this same leased location. All Pools operates from this same location pre-

viously occupied by Highland Pools using the same furniture, fixtures, equipment and inventory. The leasehold interest at this location was not disclosed as an asset in the individual Debtors' schedules.

27. After carefully considering the written evidence, testimony and credibility of witnesses, this Court is convinced from all of the circumstances that the $15,000.00 transfer from the Hubbards to Richard A. Warren with the related sale of Highland Pools assets was done with actual intent to hinder or delay creditors, by transferring or concealing the transfer within one year prior to the filing of their bankruptcy.

### FINDINGS OF FACT JUSTIFYING DENIAL OF DISCHARGE UNDER CODE § 727(a)(4)

28. A separate ground for denial of discharge is alleged under Code § 727(a)(4). Plaintiff argues that the Debtors knowingly and fraudulently made false oaths by verifying the completeness of their personal Chapter 7 schedules when in fact there were material omissions of fact. This Court finds the following omissions to exist:

a. The "loan" to Richard A. Warren of $15,000.00 made in January 1986 is not listed as an asset on Debtors' B-2 schedules nor is it shown as a pre-petition transfer on Debtors' Statement of Affairs which was filed on January 24, 1986;

b. Debtors advanced over $800.00 as start-up costs for All Pools in January, 1986. This would result in a claim in favor of the Hubbards for reimbursement from All Pools. This claim is also not listed in the Debtors' Schedules as an asset (see, e.g. Px. 27);

c. Debtors had a mutual fund account with Fidelity Destiny Plans which was not listed (see Plaintiff's Exhibit 129);

d. Debtors each had IRA accounts with Metropolitan Life Insurance Company which were not listed on their Schedules (see Exhibit 128);

e. Debtors received payment from Highland Pools during their individual bankruptcy, which payments were sup-posedly for loans or back wages. In part, these funds included:

(1) $800.00 paid to Joe Hubbard in September, 1986 for "partial repayment of loan";

(2) check to Joe Hubbard from a Highland Pools account in July, 1986 for $1,500.00 as "repayment on loan";

(3) $1,500 in or about July, 1986 representing the major portion of the $1,610.00 originally paid by All Pools to Highland Pools for its assets. The check was turned over to the Debtor Highland Pools' attorney who after the case was dismissed, returned it to the Hubbards. The Hubbards cashed the check and retained $1,500.00 as "repayment on loans";

(4) on or about February 1986 Highland Pools transferred $923.20, $563.28 and $923.20 respectively representing "past wages due" as reflected on Exhibits 30, 31 and 32; and

(5) testimony indicated that after January 31, 1986 when Highland Pools had closed down, it collected approximately $7,000.00 on its accounts receivables. Of this $7,000.00 approximately $4,845.00 was transmitted to the Hubbards for "wages, "IRA refunds", "FICA refunds", or "partial repayment of loans." It was unclear from the evidence whether this $4,845.00 included the funds separately listed above. However, nowhere in the Debtors' Schedules is there any indication that one of their assets included any funds owed to them by Highland Pools or from All Pools Services. Nowhere in Highland Pools' Schedules was there any indication that funds were owed to the Hubbards for any purpose.

f. Except for their house payment, Debtors do not list the $5,500 paid out of the settlement proceeds to creditors in response to question number 11 on their original Statement of Affairs filed in February, 1986. When amended in May, 1986 the Debtors did add a payment to "father". Testimony however indicated the payment was in fact to Joe Hubbard's stepmother. The Debtors still did

not disclose the other payments made to unsecured creditors. (See Px. 10–17); and

g. The lease agreement which Joe Hubbard entered into with E.H. Becker, Jr., reflected as Exhibit 8 is not disclosed as an asset in Debtor's Schedules.

While many of the above failures to disclose may be ascribed to mistake and inadvertence and ineffective assistance from Debtor's lawyer, the volume and timing of such omissions reflects at the least a reckless disregard for the truth. The omission of the $15,000.00 "loan" to Richard A. Warren and the failure to list possible preferential payments rise above mere mistake or inadvertence. Once a sworn statement is shown to be false, the burden to prove that the statement or omission was an honest mistake shifts to the Debtor. The Court finds that under all of the circumstances of this case, the omission of the $15,000.00 transfer, the collection of "past wages" and "loans" and failure to identify pre-petition payments to creditors as itemized above was an intentional, knowing omission calculated to defraud or hinder creditors in this case.

### FINDINGS OF FACT JUSTIFYING DENIAL OF DISCHARGE UNDER CODE § 727(a)(5), (7)

Another ground alleged to justify denial of discharge is found in Code § 727(a)(5) and (7). Plaintiff argues that the Debtors, as principals and insiders of Highland Pools, have failed to satisfactorily explain an apparent loss of assets during the Highland Pools Chapter 11 proceedings. In pertinent part, the Court makes the following additional Findings of Facts on this issue:

29. Highland Pools' Chapter 11 original Schedules reflect $9,642.54 in value of "construction tools and equipment". See (Px. 97, Schedule B–2(k)). After converting the Chapter 11 to a Chapter 7 proceeding, amended Schedules were filed reflecting a value for the same items of $0. (See Px. 101, Schedule B–2(k)).

(a) Mr. Hubbard testified that he was not sure if any or all of these items constituted assets sold to Reba Zuniaga in the Triple A transaction or to All Pools. He was unable to indicate what happened to these assets.

(b) In pre-hearing answers to interrogatories Mr. Hubbard, trying to answer the same question presented to him about the disposition of the "construction tools and equipment" stated that no inventory was available at that time and he was unaware of what items were included in that figure.

(c) At the time of the hearing in this Adversary Proceeding neither Highland Pools nor the Hubbards had any inventory or other records to shed any additional information to reflect what happened to the "construction tools and equipment".

(d) Mr. Hubbard did testify that some tools had been stolen, however this fact was not reported to the authorities nor disclosed in the Schedules of Highland Pools.

30. Highland Pools' Chapter 11 Schedules reflect $86,599.66 of accounts receivable. (Px. 97, Schedule B–2(m)). The amended Schedules in the Chapter 7 case reflect $35,580.76. (Px. 101, Schedule B–2(m)).

(a) No monthly reports as required by Bankruptcy Rule 2015(a) and Local Bankruptcy Rule 2015(a)(2) were filed with the Court. These reports require that the level of accounts of receivable generated and collected during the bankruptcy be revealed on a monthly basis.

(b) The accounting record showing which account Debtors paid Highland Pools is maintained on "ledger cards".

(c) Along with a number of other items of furniture (Px. 23) and miscellaneous equipment and inventory (Px. 24) which Highland Pools transferred to All Pools, it additionally transferred the "ledger cards".

31. Highland Pools' Chapter 11 Schedules reflect $25,500.00 of "desks, typewriters, computer, printer, telephones and radios." (Px. 97, Schedule B–2(j)). The Chapter 7 Schedules reflect $2,500.00. (Px. 101, Schedule B–2(j)).

(a) The only evidence to show transfers of these type of items was the Triple A transfer to Reba Zuniaga (Px. 130) which did not involve any description of the items in question and the All Pools transfer (Px. 23, 24) which involved some of these types of items but were valued at only a fraction of the $1,610.00 paid by All Pools. It should be noted that the $1,610.00 paid by All Pools took place only about 20 weeks after Highland Pools original Schedules were filed.

(b) Mr. Hubbard testified that a number of desks and similar furniture still remained outstanding and were owned by Highland Pools, however they were all located in the same premises where All Pools now operates its business and are in fact used by All Pools' employees. There was, however, no list or estimate of value of the remaining items of furniture other than the $2,500.00 estimate provided in the amended Chapter 7 Schedules.

32. Highland Pools' Chapter 11 Schedules reflect $7,255.06 of "swimming pool chemicals and supplies." (Px. 97, Schedule B–2(1)). The Chapter 7 Schedules reflect a value of $0. (Px. 101, Schedule B–1(1)). Again, the only two explained transfers were the Triple A and All Pools transactions. Neither transaction accounts for $7,255.06 of inventory. Post-petition work done by the Debtor for customers could explain use of inventory, however it would generally translate into an increase in the accounts receivables column of the Debtor. No explanation is given how the inventory itself got down to $0.

33. A number of transfers of monies from Highland Pools to the Hubbards took place between August, 1985 and July, 1986. These have generally been explained in testimony as repayment by Highland to the Hubbards of various loans or back wages which were owed. The Schedules of the Highland Pools Chapter 11 and Chapter 7 cases, however, reflect no obligation or claim owed to the Hubbards. In addition, the Schedules in the Hubbards' case reflect no asset represented by sums due and owing to them from Highland Pools.

34. Just before and after the Highland Pools bankruptcy, the Hubbards began to construct an in-ground swimming pool and jacuzzi in the back yard of their home which is now claimed as exempt. Plaintiffs Exhibits 121–127 were color photographs which reflect the size and magnitude of the pool and associated decking. The pool was constructed by Highland Pools using its employees, inventory, equipment and other materials. No records are available to indicate how much was spent on these improvements, how much was paid by the Hubbards and how much was owed by the Hubbards to Highland Pools. The estimate of sums owed and not paid to Highland Pools range from $8,000.00 to $15,000.00. The Schedules of Highland Pools do not reflect this claims as one of its assets and the Hubbards' Schedules do not reflect this sum as a liability due owing to Highland Pools.

Overall this Court does not believe the Debtor's explanations are reasonable nor are they satisfactory within the meaning of § 727(a)(5). The unexplained losses of assets described above support the complaint against discharge pursuant to § 727(a)(7).

## FINDINGS OF FACT WHICH DO NOT JUSTIFY DENIAL OF DISCHARGE

The following Findings will touch briefly on transgressions researched and emphasized by the Plaintiff but which do not alone justify denial of discharge under § 727(a).

35. After the Hubbards began working for All Pools Service, they sold the remaining assets of Highland Pools to All Pools Service. Highland Pools was still in Chapter 11 at this time. On February 13, 1986, the Hubbard's attorney filed a Motion to Convert to Chapter 7. On February 24 he filed a Motion to Dismiss. Because conversion of a Chapter 11 to a Chapter 7 is a matter of right upon a few conditions not relevant here,[3] the Motion to Convert was granted on February 21. Because a Mo-

---

3. 11 U.S.C. § 1112.

tion to Dismiss may be granted only for cause after notice and a hearing[4] the Motion to Dismiss was not granted until June 20, 1986.

■ 36. As they had at several other points throughout their several bankruptcies, the Hubbards acted as if what they intended (dismissal of their corporate bankruptcy) had occurred at the time they willed it. It appears the Hubbards gave no thought to seeking Bankruptcy Court approval for the sale of Highland Pool's assets to All Pools Service for $1610.00. This may have been a fair price (although Debtors testified they set prices at what would be received at a "fire sale"). It would presumptively have been fair had proper notice and lack of creditor objections timely occurred as prescribed by 11 U.S.C. § 363. Since those procedures were not followed, the Court is left to determine whether this transfer for possibly inadequate consideration was made with intent to defraud creditors. I find here a disregard for bankruptcy procedure but under the facts, which include evidence of little real help by way of attention or explanation from their attorney, no corresponding intent to hinder, delay or defraud creditors.

37. The $1610.00 check from All Pools Service to Highland Pools written by Cathy Hubbard was not deposited to the bank account of Highland Pools or given as a cashiers check to the Highland Pools Chapter 7 Trustee. It was, however, given to the Hubbards' bankruptcy attorney who testified he told the Chapter 7 Trustee of the check's existence and kept it available for the Chapter 7 Trustee if it was requested.

38. In the schedules for the Highland Pools Chapter 11 case the following material omissions not already discussed elsewhere, were made:

(a) Several lease, utility, or security deposits, including Southwestern Bell ($900.74), were not disclosed as assets on the Highland Pools schedules.

(b) A 1972 van was not disclosed as an asset of Highland Pools.

The Court finds these omissions are explained to the satisfaction of the Court by the fact that the Hubbards thought more in cash flow than accrual terms and by simple honest mistake.

■ 39. Much is made of the fact that the Debtors frequently took out "less cash" of $250.00 to $500.00 when they made deposits to their personal bank account, and were then unable to detail the subsequent transactions when the cash was spent. This habit seems natural enough and the Debtors' inability to detail where this cash was spent other then food, gas, and normal living expenses does not rise to the level condemned by 11 U.S.C. § 727(a)(5).

40. The records of Highland Pools were not elaborate or perfect but the Court finds the form and volume of records adequate and justifiable under the circumstances. It is the post-petition records with which this Court has had problems, as indicated above.

## CONCLUSIONS OF LAW

A. Case law decided under the Bankruptcy Act of 1898 as to the standards for denial of discharge, under what are now sections 727(a)(2), (3), and (5), remains applicable under the Bankruptcy Code of 1978. COLLIER ON BANKRUPTCY (15th Ed. Volume 4, ¶¶ 727.02[1][a], 727.03[1], 727.08.

B. The actions of the Debtors in transferring $15,000 to Richard Warren, failing to keep an adequate record (such as a written promissory note) of this transaction, and failing to disclose the loan on their bankruptcy schedules is objectionable under 11 U.S.C. § 727(a)(2) (transfer or concealment of property with intent to hinder or delay creditors), and under § 727(a)(4) (knowingly and fraudulently making false oath).

C. The failure to list assets and failure to disclose possible preferences in the Hubbards' personal bankruptcy described in Finding of Fact No. 28 above is objectiona-

---

**4.** 11 U.S.C. § 1112.

ble under 11 U.S.C. § 727(a)(4) as a knowing and fraudulent false oath.

D. Many of the other omissions and questionable dealings of the Debtors are not sufficient to justify denial of discharge. Some are explainable as honest mistake or inadvertence. Many reflect a profound lack of understanding of the goals and procedures of the bankruptcy system. To that extent, this case is an indictment of the Bankruptcy Court and the lawyers who practice before it. The lawyer in this case failed to instill in his clients an appreciation of the big picture of bankruptcy. He failed to emphasize the dual nature of the goals of bankruptcy: to give honest debtors a fresh start, free from the pressures of excessive debt but also a duty to take whatever non-exempt assets the debtors have accumulated and to divide those assets fairly among existing creditors (who have, after all, advanced real goods and services to the debtors with the expectation of fair repayment). See *Burlingham v. Crouse*, 228 U.S. 459, 33 S.Ct. 564, 57 L.Ed. 920 (1913).

E. This Court routinely issues an Order near the beginning of each case which outlines the debtor's duties. Bankruptcy practitioners must make it a part of their practice to be sure clients understand these duties and understand the reasons for various bankruptcy procedures (such as the need for Court approval of sales out of the ordinary course). The Debtor must also understand that when one individual becomes insolvent and seeks bankruptcy protection, many interests (including those of creditors) are threatened and must receive protection. When practitioners become too busy to give each case the attention it deserves, when participants in the process become too adversarial, the Court is forced, as in this case, to attempt to restore balance. All of these competing interests are generally satisfied by full and complete disclosure. Code § 521(1) requires the Debtor to file a list of creditors, a Schedule of Assets and Liabilities, a Schedule of Current Income and Expenditures, and a Statement of the Debtor's Financial Affairs. Bankruptcy Rule 1007(b) identifies the Schedules and Statements which are required and identifies them as the forms prescribed by Official Form Nos. 6, 6A, and 7 or 8 as appropriate. Bankruptcy Rule 9009 orders that the Official Forms prescribed by the Judicial Conference of the United States shall be observed. Official Form No. 6, entitled Schedules of Assets and Liabilities, as well as Official Form No. 7, entitled Statement of Financial Affairs for Debtor Not Engaged in Business (or No. 8 If Engaged in Business) require that "each question shall be answered or the failure to answer explained."

F. It is not allowable for a Debtor to pick and choose the information to be given on answers to these forms. All claims, as defined in Bankruptcy Code § 101(4), must be disclosed. The Debtor must list every entity who may assert a claim against the Debtor, the Debtors' property or the Debtors' estate. Creditors are entitled to be aware of all persons who have had transactions with the Debtor in order to conduct appropriate and proper discovery into assets or into transactions which may lead to the disclosure of or recovery of assets. It is not permissible for a Debtor to "agree" to remain liable to an unlisted claimant who might rely on Code § 523(a)(3). It is also not permissible for a Debtor to "net out" an asset when the particular value of that asset is less than liabilities against it, and leave such an asset off of their Schedules. An interest in a partnership with a negative net worth, for example, must be listed even though it is felt to be "worthless" by the Debtor. Creditors are entitled to be aware of the existence of such assets, even if "worthless," so that they may have the opportunity to investigate. Frequently suits to avoid liens or recover preferences are brought after investigation by interested creditors.

G. Section 727 is a section dedicated primarily to the protection of creditor interests in that it prescribes the limits beyond which a debtor may not go and still receive a discharge. *Kentile Floors, Inc. v. Winham*, 440 F.2d 1128 (9th Cir.1971); see also *Northern Trust Co. v. Garman*, 643 F.2d 1252 (7th Cir.1980) in which the Court stated

"we believe the Act was meant to discharge only the honest debtor from his debts and that the Act should be liberally applied to protect the bankrupt only where there is no intent to violate its provisions."

Section 727 denials of discharge serve to emphasize the second goal of bankruptcy described above, that non-exempt assets must be disclosed and surrendered to the Trustee, to be fairly distributed among existing creditors in accordance with the priorities set out in the Bankruptcy Code. The balance between the two goals of bankruptcy (discharge of honest debtors/distribution of non-exempt assets to creditors) is served by denial of discharge in this case in that Debtors' knowing and fraudulently made false oath negates their honesty and the Debtors' attempt to transfer or conceal assets frustrated the distribution of non-exempt assets to creditors.

For the reasons discussed above, discharge is DENIED. A separate Order evidencing this Opinion will be entered of even date herewith.