**In re L. Craig CALDWELL, Debtor.**

**Bankruptcy No. 88B–07175.**

United States Bankruptcy Court,
D. Utah, C.D.

June 9, 1989.

Michael N. Zundel, Jardine, Linebaugh, Brown & Dunn, Salt Lake City, Utah, for Utah Production Credit Ass'n, creditor.

Daniel R. Boone, Salt Lake City, Utah and Anthony J. Famulary, Roosevelt, Utah, for L. Craig Caldwell, debtor.

## MEMORANDUM DECISION

JUDITH A. BOULDEN, Bankruptcy Judge.

This contested matter comes before the court on the motion of Utah Production Credit Association (UPCA) to convert this preconfirmed chapter 12 case to a case under chapter 7 pursuant to 11 U.S.C. § 1208(d)[1] and for relief from stay as to real property for cause pursuant to 11 U.S.C. § 362(d)(1).[2] The issues raised in the motion to convert to chapter 7 are of first impression for this court and warrant thorough consideration. The existing circumstances of the case and short time frame mandated by sections 1221 and 1224 however, prompt the court to issue this Memorandum Decision as expeditiously as possible.

---

1. 11 U.S.C. § 1208(d) provides:

    On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter or convert a case under this chapter to a case under chapter 7 of this title upon a showing that the debtor has committed fraud in connection with the case. ·

2. Subsequent references are to Title 11 of the United States Code unless otherwise noted.

## JURISDICTION

The court has jurisdiction over the subject matter of and parties to this contested matter pursuant to 28 U.S.C. §§ 1334 and 157. Venue in this division is proper. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(A) and (G).

## FACTS

L. Craig Caldwell (Caldwell) [3] has been engaged in a farming operation known as the Cat Creek Ranch in the Vernal area of Utah for a number of years. He also has an ownership interest in Hiko Bell Mining and Oil Company (Hiko Bell). Caldwell is a gentleman of some years who testified that he has an eighth grade education. He has, however, acquired considerable assets and appears well versed in the oil industry, business and farming. His farming operation consists of raising alfalfa and grain, and the production of cattle and sheep for market and fiber.

Caldwell has had a long-term relationship with UPCA, using the proceeds of various loans from that entity for farming purposes. On April 24, 1986, Caldwell executed a security agreement in favor of UPCA which pledged real property, livestock, crops and certain equipment and machinery. The equipment specifically denominated in the security agreement was a tractor, baler, bale wagon and windrower. The document also purports to grant a security interest in all machinery, equipment and fixtures owned at the time of signing or thereafter acquired by the borrower. It is undisputed that UPCA had perfected its security interest by appropriate filings with the County Recorder and the State of Utah.

The security agreement collateralized obligations owed by Caldwell to UPCA evidenced by promissory notes dated November 24, 1986, in the amount of $88,972 and January 29, 1987, in the amount of $5,000. The amount of the total obligation owed by Caldwell to UPCA is now $85,483.93. The stipulated value of the real property securing the obligation is $40,000. No evidence was presented regarding the value or extent of other collateral securing the loan.

The obligation to UPCA became due and payable. Upon Caldwell's failure to satisfy the obligation, UPCA initiated proceedings in state court in May of 1988 to foreclose its liens against Caldwell's real property. To forestall that litigation Caldwell, through his attorney Anthony J. Famulary (Famulary), filed a petition for relief under chapter 13 on December 6, 1988. Instead of filing a Chapter 13 Statement within 15 days as provided by Bankruptcy Rule 1007(c),[4] Caldwell filed a motion to convert from chapter 13 to chapter 12. After paying the additional filing fee required under chapter 12, the case was duly converted on February 3, 1989, and Caldwell was directed to file the relevant chapter 12 lists of assets and liabilities.[5]

On January 26, 1989, UPCA filed a motion to dismiss or in the alternative for

---

**3.** *In re L. Craig Caldwell,* bankruptcy number 88B–07175, the within chapter 12 case, is to be distinguished from *In re Lawrence C. Caldwell, II,* bankruptcy number 88B–02725, a chapter 7 case also pending before this court. L. Craig Caldwell is the father of Lawrence C. Caldwell, II.

**4.** This jurisdiction has not adopted the Interim Rules Pertaining to Chapter 12 as promulgated by the Advisory Committee on Bankruptcy Rules. The court notes, however, that no change in the court's decision would be mandated if such adoption had occurred because the interim rules as proposed would have no effect on any portion of this ruling.

**5.** Standing Order #39 as amended November 25, 1986, requires the following relevant documents:

d. a schedule of Assets and Liabilities conforming substantially to Official Form #6,

e. a Statement of Affairs for a Debtor Engaged in Business conforming substantially to Official Form #8, plus Chapter 12 Supplement,

f. if applicable, a List of Equity Security Holders pursuant to Bankruptcy Rule 1007(3),

g. if the debtor's Schedules include consumer debts which are secured by property of the estate, a Statement of Intent pursuant to Sec. 521(2) of the Code,

h. a Chapter 12 Statement of Current Income and Expense in the form designated by the court's Estate Administrator (or the U.S. Trustee, if applicable)....

relief from the stay in the chapter 13 case asserting as the basis of the motion Caldwell's failure to file schedules of assets and liabilities within 15 days from the date of filing the petition. UPCA further alleged that if the case had been converted to a chapter 12, the debtor had failed to file the required chapter 12 documents and such failure constituted cause to grant relief from the automatic stay under section 362(d)(1).

Caldwell eventually filed a Statement of Individual Debtor (Chapter 12 statement) on Friday, February 24, 1989, although the document was executed by Caldwell on February 9, 1989. A hearing was held on UPCA's motion to dismiss or in the alternative for relief from the stay on Monday, February 27, 1989. After due consideration, the court denied the relief sought.

The court set a meeting of creditors in Caldwell's chapter 12 case for March 21, 1989, a continued section 341 meeting for June 13, 1989,[6] and a confirmation hearing for July 17, 1989. Caldwell and counsel appeared at the initial meeting of creditors and attended immediately thereafter an examination conducted by UPCA under Bankruptcy Rule 2004.

On April 4, 1989, UPCA filed the within Motion to Convert to Chapter 7 and Motion for Relief from Stay as to Real Property (Motion). The Motion alleged that Caldwell had committed fraud in connection with this case by filing with the court a Chapter 12 statement which was materially false.

UPCA claimed the document omitted assets which should have been listed as property of the estate and that such omission was knowingly, intentionally and fraudulently made. The hearing on UPCA's Motion was scheduled for Monday, April 24, 1989. On April 21, 1989, the preceding Friday, Caldwell filed an amendment to the Chapter 12 statement which substantially expanded the list of assets in the estate. It is uncontroverted that the Chapter 12 statement omitted numerous assets owned by Caldwell as of the date of filing. After extensive testimony, the April 24, 1989, hearing was continued for further evidence until May 15, 1989. No further amendments have been made to Caldwell's Chapter 12 statement as of the issuance of this opinion on June 9, 1989.

In support of UPCA's Motion the following documents listing assets and liabilities were received into evidence by the court: (1) the Statement of Individual Debtor (Chapter 12 statement) sworn to under penalty of perjury filed on February 24, 1989, listing assets valued at approximately $370,323 and containing pages 19–A and 19–B, the relevant portions of which are reproduced here as Exhibit "A";[7] (2) an amendment to the Chapter 12 statement (Chapter 12 amendment) filed April 21, 1989, listing assets valued at approximately $716,295 signed by Caldwell but not under penalty of perjury,[8] the relevant portions of which are reproduced here as Exhibit "B"; and, (3) an unfiled, unsigned Chapter 13

6. In this jurisdiction, a continued meeting of creditors is held at a point in time after the date required for a Chapter 12 Plan to be filed, but prior to the scheduled confirmation hearing. The purpose of the continued meeting of creditors is to allow the debtor, creditors and the Standing Trustee to review the plan prior to the confirmation hearing.

7. The assets not at issue listed on the Chapter 12 statement are: (1) the debtor's 50% interest in a house at 250 North 1100 West, Vernal, Utah, valued at $130,000; (2) a house at West Main, Vernal, Utah, valued at $40,000 with encumbrances of $26,000; (3) a ranch and ranch house at 1027 South 1500 East, Vernal, Utah, valued at $33,000 and secured to UPCA; and, (4) wool incentives of $1,200 also secured to UPCA.

Unencumbered assets listed on the Chapter 12 statement included: (1) unitemized furniture valued at $1,500; (2) unitemized appliances valued at $1,500; (3) a shotgun valued at $200; (4) unitemized miscellaneous items valued at $600; (5) a checking account at Zions First National Bank containing $445; and, (6) mining and oil stock in Hiko Bell consisting of 4,417.84 shares with a value of $44,178. The actual number of shares is apparently 4,417,840.

Similar assets are listed on the Chapter 12 amendment, although their descriptions and the value of the assets are inconsistent.

8. Caldwell's signature appears below the statement, "I, L. Craig Caldwell, hereby certify that the Chapter 12 amendments are true and correct to the best of my knowledge and belief." Bankruptcy Rule 1008 requires that all amendments be verified or contain an unsworn declaration under penalty of perjury as provided in 28 U.S.C. § 1746.

Statement (Chapter 13 Statement) prepared by Caldwell prior to conversion from chapter 13 to chapter 12 which listed assets valued at approximately $423,033, the relevant portions of which are reproduced here as Exhibit "C".[9] The Chapter 12 statement contained the least assets. It is apparently a modification of the Chapter 13 Statement but omitted certain assets. The Chapter 12 amendment significantly expanded the asset listing to conform to Caldwell's testimony at the section 341 meeting and Rule 2004 examination. It is uncontested that all the assets listed or testified to were Caldwell's property as of the date of filing.

Caldwell's testimony revealed a number of inconsistencies in the documents filed with the court as well as various omissions which still existed as of the hearing. For example, Caldwell testified that the Case backhoe which was listed on the Chapter 12 amendment and valued at $7,500 was probably worth closer to $20,000. Caldwell also testified regarding transactions between himself and his son, Lawrence C. Caldwell, II. One of those transactions was evidenced by a promissory note payable to Caldwell from Jay Kirk and Lawrence C. Caldwell, II and was listed on the Chapter 13 Statement in the amount of $45,000. The asset is not listed on the Chapter 12 schedules. The evidence indicates that the obligation may have been reduced to judgment.

In relation to the indebtedness between Caldwell and his son, a lawsuit was brought in state court by Western United Mines, Inc. and Del Rio Drilling Programs, Inc., companies in which Lawrence C. Caldwell, II had an interest, against Hiko Bell, Caldwell and others. At some point, either coincidental to the chapter 13 filing in early December of 1988 or in February of 1989, an undated settlement agreement was executed between Caldwell and the other par-

ties resolving the pending state court litigation. The settlement agreement, among other things, released a promissory note dated September 4, 1981, in which Kirk and L. Caldwell were the makers and C. Caldwell was the payee in the principal amount of $29,000.[10] The agreement further indicated that, upon delivery of personal property set forth in the agreement, certain parties would pay to Caldwell the sum of $2,500. The transaction set forth in the settlement agreement is not listed on any document filed with the court by Caldwell. Neither is a note from Lawrence C. Caldwell, II to Caldwell in the amount of $45,000, nor one in the amount of $29,000. The facts however, indicate that either a promissory note or the settlement of $2,500 was owed to Caldwell as of the date of filing.

The transaction between Caldwell, his son and others, and their various corporate entities, appears complex and worthy of full disclosure. The testimony from Caldwell was vague and confusing and the exhibits received into evidence only seem to scratch the surface of the dealings between father, son and their various entities. Caldwell further testified that the $2,500 settlement was actually paid postpetition but was delivered to an attorney for Caldwell who had not been approved by this court to represent Caldwell or to receive assets of the estate.

At the continued hearing in this matter, Caldwell testified regarding additional items of personal property, including a pipe threader and small tools and equipment, which he believed were omitted from the schedules. Caldwell may have meant to include these items under the miscellaneous heading on the Chapter 12 statement, however, the value testified to and the value on the Chapter 12 statement is inconsistent.

---

**9.** The exhibits have been reproduced verbatim and in the form and page styling of the originals received into evidence by the court. Line by line comparison is impossible because of the altered style and designation of the assets. Several inconsistencies exist in the addition of the value of the assets; therefore, any figures in this opinion are approximations. For example, the actual total of the assets listed on the Chapter 13 Statement "List of Farm Assets of Craig Caldwell" is $106,700, not $96,700 and the Summary of Assets is $444,723 not $423,033.

**10.** The evidence is unclear as to whether this is a reference to the same promissory note in the amount of $45,000 mentioned in the Chapter 13 Statement.

Caldwell also testified that he didn't think he had listed all of his debts and referenced a complaint filed on September 1, 1988, in federal court in Utah by J. William Powell, Sr. (Powell), et al., against Hiko Bell, Caldwell and others. The complaint listed various causes of action arising from an oil venture between the parties. The relief sought was reimbursement from Caldwell and others to the plaintiffs for lost profits and contributions to Hiko Bell, as well as punitive damages in the amount of $1 Million. Powell was not listed as a creditor on the Chapter 12 statement or the Chapter 12 amendment. No description of the litigation or of the contingent or disputed nature of the amount claimed by Powell appears on any list of liabilities filed with the court.

From Caldwell's demeanor, the court remains unconvinced that there is, even yet, full disclosure of all the assets and liabilities of this debtor.[11] His continued equivocal conduct and indecisive responses regarding his assets and liabilities leads the court to doubt the overall accuracy of his testimony and the documents filed with the court.

## ARGUMENT

### A. STAY LIFT

■ UPCA asserts that Caldwell's fraudulent conduct, delay and inaccuracies constitute cause to lift the automatic stay under section 362(d)(1). It further alleges that Caldwell has not insured the home located on the real property which partially secures its loan. The evidence controverts the lack of insurance and the court finds that no cause based upon lack of insurance exists to lift the automatic stay.

For the court to make a determination that Caldwell's conduct is sufficient to warrant lifting the automatic stay for cause, the court must find that UPCA has or will suffer harm as a result of such conduct. "Cause to lift the stay exists when the stay harms the creditor and lifting the stay will

not unjustly harm the debtor or other creditors." *In re Opelika Mfg. Corp.*, 66 B.R. 444, 448 (Bankr.N.D.Ill.1986). Whether or not the delay created by Caldwell in converting from one chapter to another or whether the lack of information provided in the Chapter 12 statement has harmed UPCA, other than in incurring attorneys fees in the prosecution of this matter, is unclear from the evidence.

In addition, UPCA has failed to show that the debtor and other creditors will escape injury if the stay is lifted.

> In determining whether or not cause exists, the bankruptcy court must balance the inherent hardships on all parties and base its decision on the degree of hardship and the overall goals of the Bankruptcy Code ... the Court must look at the totality of the circumstances....

*In re Opelika Mfg. Corp.*, 66 B.R. at 449. The security documents on file indicate that UPCA has a substantial interest in both real and personal property of the estate. Based on the evidence submitted, the court is unable to make any finding as to whether or not the obligation owed to UPCA is over or undersecured. If UPCA is oversecured, as may well be the case, it would be detrimental to the estate to allow UPCA to foreclose upon portions of its collateral if equity exists which would benefit other creditors.

Based upon the lack of evidence as to the specific harm to UPCA coupled with UPCA's failure to show that no harm will befall other creditors as a result of lifting the stay, the court finds that no cause exists to lift the automatic stay. The relief sought under section 362(d)(1) is denied.

### B. CONVERSION TO CHAPTER 7

#### 1. Standard Of Proof

■ This case is of first impression in interpreting section 1208(d). Initially, the court must determine the standard of proof the movant must sustain. The parties ap-

---

**11.** Caldwell filed a March, 1989 financial report on April 24, 1989, which references an Exhibit "A" containing an amended plan of reorganization, tax returns, SEC forms for Hiko Bell, a decree of divorce and pictures of his farm. Those items referenced in the exhibit are not in the court's file.

proach this issue from two viewpoints. Caldwell's argument, both on the standard of proof and on other elements, is that a section 1208(d) action is analogous to a section 523 [12] action where a showing of fraud is required. Therefore, the standard of proof should be by clear and convincing evidence. *E.g., Joseph v. Stone (In re Stone)*, 91 B.R. 589, 591 (D.Utah 1988) (section 523(a)(2)) and *S.J. Groves & Sons Co. v. Peters (In re Peters)*, 90 B.R. 588, 605 (Bankr.N.D.N.Y.1988) (section 523(a)(4)).

UPCA argues in opposition that this action is analogous to a section 727(a)(4) action. The controlling case law in this jurisdiction requires a standard of proof of preponderance of the evidence. *Farmers Coop. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982).

The only reported cases this court has found which deal with the substance of section 1208(d), *In re Zurface*, 95 B.R. 527 (Bankr.S.D.Ohio 1989) and *In re Graven*, 101 B.R. 109 (Bankr.W.D.Mo.1989), do not address the applicable standard of proof necessary to convert a chapter 12 case to chapter 7. Nor does the statute delineate the elements of the cause of action with the specificity found in either section 523 or section 727. No legislative record is helpful to determine what specific acts Congress intended to prohibit, thus giving guidance to what standard of proof should be applied, and the statutory wording is broad indeed.

The court has reviewed the statute and finds that language similar to section 1208(d) is found elsewhere in the Code under section 727(a)(4).[13] Under the doctrine of *in pari materia*, this court should consider the current case law interpretation of section 727(a)(4) in determining what conduct is proscribed by section 1208(d). 2A Sutherland Statutory Construction § 51.03 (4th Ed.1985).

Unless the context indicates otherwise, words or phrases in a provision that were used in a prior act pertaining to the same subject matter will be construed in the same sense. It has been said that 'the need for uniformity becomes more imperative where the same word or term is used in different statutory sections that are similar in purpose and content ... or where ... a word is used more than once in the same section.'

2A Sutherland Statutory Construction at § 51.02. If conduct described in section 727(a)(4) is the type of conduct proscribed by section 1208(d), it is arguable that the standard of proof should be the same under section 1208(d) as under section 727(a)(4). However, fraud is usually required to be proven by the clearest evidentiary standard possible. *Bank of Utah v. Auto Outlet, Inc. (In re Auto Outlet, Inc.)*, 71 B.R. 674, 677 (Bankr.D.Utah 1987).

Given two conflicting standards, the court should look to the consequences of choosing one or the other standard in this case as well as those cases which may come before the court in the future.[14] If

---

**12.** Chapter 12 allows creditors to bring actions under section 523 for determination of the dischargeability of a debt.

**13.** Section 1208(d) provides:

On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter or convert a case under this chapter to a case under chapter 7 of this title upon a showing that the *debtor has committed fraud in connection with the case.* (emphasis added).

In comparison, section 727(a)(4) provides:

(a) The court shall grant the debtor a discharge, unless—
....
(4) the *debtor knowingly and fraudulently, in or in connection with the case—*
(A) made a false oath or account;

(B) presented or used a false claim;
(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs ... (emphasis added).

**14.** It is certainly foreseeable that fraud in connection with a case could encompass fraud not set forth in section 727 but delineated in section 523. For example, circumstances could exist in which the debtor, with the intent to defraud a creditor, transferred property of the debtor in excess of one year before the date of filing. Though not actionable under section

this court applies the standard of proof of preponderance of the evidence, actions in future cases could be brought under section 1208(d) upon facts more closely related to actions under section 523 which would require application of a clear and convincing standard. Inconsistent lines of case law may develop. The resulting confusion would be needless and prejudicial.

The court should also consider the modification of prior policy found in the option to convert a case to chapter 7 provided in section 1208(d). Traditionally, involuntary filings or involuntary conversions of a farmer to chapter 7 were not permitted.[15] The protection against involuntary conversion of farmers has been specifically withdrawn under chapter 12. It appears that those seeking relief under chapter 12 waive the protection which would ordinarily be afforded if the filing were under one of the other chapters of the statute but in the capacity of a farmer.[16]

However, in a chapter 12 case:

727(a)(2)(A), the conduct may fall within section 523(a)(2)(A). The court could also find that the fraud was in connection with the case, thus satisfying section 1208(d) and warranting conversion or dismissal. Because of the nature of the facts of this case, this court need not decide if section 523 actions sounding in fraud could be considered to be "in connection with the case" and thus fall under section 1208(d).

15. Section 303(a), section 1112(c) and section 1307(e).

16. The Code retains the prohibition against an involuntary filing against a family farmer in section 303(a). A comparison of the differences between a family farmer and a farmer is helpful.

Section 101(17) defines "family farmer" as an:

(A) individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $1,500,000 and not less than 80 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning such individual or such individual and spouse was filed; or

The rights of others to seek conversion are narrowly circumscribed. A party in interest may obtain conversion to Chapter 7 only upon a showing that the debtor has committed fraud in connection with the case.

. . . .

[The] conversion ... [statute] evidence[s] a general policy of debtor control in Chapter 12—a slightly stronger policy in this regard than the parallel policy of debtor control in Chapter 13. The debtor is given virtually unlimited ability to back out of the proceeding at any time. Other parties must show cause to dismiss and can only force conversion to Chapter 7 in extraordinary circumstances. The debtor is thus given very broad leeway to attempt reorganization, even when its creditors are pressing for liquidation.

Herbert, *Once More Unto the Breach, Dear Friends: The 1986 Reforms of the*

(B) corporation or partnership in which more than 50 percent of the outstanding stock or equity is held by one family, or by one family and the relatives of the members of such family, and such family or such relatives conduct the farming operation, and

(i) more than 80 percent of the value of its assets consists of assets related to the farming operation;

(ii) its aggregate debts do not exceed $1,500,000 and not less than 80 percent of its aggregate noncontingent, liquidated debts (excluding a debt for one dwelling which is owned by such corporation or partnership and which a shareholder or partner maintains as a principal residence, unless such debt arises out of a farming operation), on the date the case is filed, arise out of the farming operation owned or operated by such corporation or such partnership; and

(iii) if such corporation issues stock, such stock is not publicly traded....

Section 101(19) defines "farmer" as:

"farmer" means (except when such terms appears in the term "family farmer") person that received more than 80 percent of such person's gross income during the taxable year of such person immediately preceding the taxable year of such person during which the case under this title concerning such person was commenced from a farming operation owned or operated by such person....

*Reformed Bankruptcy Reform Act*, 16 Cap.U.L.Rev. 325, 352–53 (1987). This change in policy should not be considered lightly by the court. Such a substantial revision in the historical treatment of those engaged in agriculture argues that the standard of proof necessary under section 1208(d) should be based upon the clearest analysis of the facts and with the conviction that the actions of the debtor are so egregious that involuntary conversion to a chapter 7 is warranted.

The court is also aware that Bankruptcy Rule 7001 does not include an action based upon section 1208(d) as an adversary proceeding with the associated extensive discovery and provisions for full trial. An adversary proceeding is required for actions under section 523 or section 727. The findings made in this contested matter could, in fact, be used in a subsequent adversary proceeding in this case were it converted to a chapter 7. Since the consequences of conversion are so grave and the input and preparation arguably less in this contested matter than that provided for under Rule 7001, the court should proceed conservatively and make a determination based upon the strongest showing possible by the movant in order to protect the rights of the chapter 12 debtor.

It is reasonable to apply a standard of proof consistently to this section of the statute and not to waiver, depending on the facts of the case, between a standard of preponderance of the evidence and clear and convincing evidence. The court concludes that based upon: (1) the broad language of section 1208(d) which does not delineate the specific circumstances of fraud found in section 727 or section 523; (2) the unnecessary confusion which may result in applying different standard of proof to the same section of the Code; (3) the substantial modification of historical protection for farmers; (4) the expedited nature of a contested hearing; and, (5) because fraud traditionally has required a high burden of proof, a standard of clear and convincing evidence must be applied in order to convert or dismiss a case under section 1208(d).

### 2. Fraud In Connection With The Case

■ UPCA argued that the asset listing in this chapter 12 was so deficient and that Caldwell's course of conduct was so egregious that the court must find that Caldwell had the requisite intent and did, in fact, commit fraud in connection with this case. The proof UPCA relied upon was the variation between the Chapter 13 Statement and the Chapter 12 statement, the inconsistencies in Caldwell's testimony and the continuing failure to file accurate asset and liability lists.

■ In opposition, Caldwell denied that it was his intent to fail to disclose his assets and liabilities. He asserted the omissions were merely caused by mistake or inadvertence and that he should be allowed to freely amend his asset and liability lists. Because UPCA has proven that the documents filed with the court were indeed inaccurate, it is now Caldwell's burden to convince the court that his excuses negate the omissions. "Once a sworn statement is shown to be false, the burden to prove that the statement or omission was an honest mistake shifts to the Debtor." *Poolquip–McNeme, Inc., v. Hubbard (In re Hubbard)*, 96 B.R. 739, 747 (Bankr. W.D.Tex.1989).

The court may base its evaluation of Caldwell's claim of mistake or inadvertence on his course of conduct both before and after the filing of the case. "Fraudulent intent of course may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *Strunk*, 671 F.2d at 395; *see also, Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871, 875 (8th Cir.1988); *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir.1986); and, *Devers v. Bank of Sheridan, Montana (In re Devers)*, 759 F.2d 751, 753–54 (9th Cir.1985).

Caldwell testified that the petition was intended to halt UPCA's collection actions in state court. Famulary gave Caldwell a blank Chapter 13 Statement to fill out and instructed Caldwell and Robert Covington

(Covington) [17] to list all assets on the documents. He did not instruct them to omit any assets from the lists prepared.

Although Famulary's testimony is vague, apparently several drafts of the Chapter 13 Statement were prepared. He could not recall whether the exhibit received into evidence, a portion of which is set forth in Exhibit "C", was the final Chapter 13 Statement which was to be filed with the court. It does not contain a signature to a perjury statement. Caldwell testified however, that he had been informed that the Chapter 13 Statement was filed with the court in substantially the same form as the exhibit and that he intended it to be filed as an accurate representation of his assets and liabilities. It never was.

The information included in the Chapter 13 Statement was used to create the Chapter 12 statement. Several reasons are advanced as to why the two documents differ. Famulary testified that though the petition was filed some two months earlier, the Chapter 12 statement was "filed in a rush" without time to proofread the document. He thought the Chapter 12 statement had to be filed on February 10, 1989. Caldwell appeared at Famulary's office late in the day on February 9, 1989, and, without reading the Chapter 12 statement, signed it under penalty of perjury. Famulary alleged that he or his staff then mailed the Chapter 12 statement to the court. It was not received. The Chapter 12 statement was not filed with the court until February 24, 1989, the Friday prior to the hearing on this matter.

The court disregards the argument advanced by Caldwell that the distance of 35 miles between Caldwell and Famulary inhibited his ability to produce accurate schedules. The distance is insignificant, especially in this state. Caldwell further argues that the circumstances of Famulary's practice, including his inability to obtain the appropriate Chapter 12 forms, further contributed to the inaccurate listing of assets on the Chapter 12 statement.[18] The court finds this argument without merit. There is nothing in the items which Caldwell failed to disclose that are intrinsically chapter 12 items. They are not encompassed in the Chapter 12 Statement of Current Income and Expense or the jurisdictional statement contained in the Chapter 12 Supplement which are unique to chapter 12. The items omitted are assets and liabilities. This information is required in any bankruptcy filing, be it chapters 7, 11, 13 or 12. Indeed, the asset listings are on separately prepared exhibits attached to the forms. The argument that somehow the difficulty in obtaining the appropriate Chapter 12 forms prevented the accurate listing of assets and liabilities required in every bankruptcy filing is disingenuous.

Caldwell also indicated that Covington's input into the preparation of the documents was inaccurate. The court will not permit Caldwell to place a portion of the blame on Covington. Covington was merely assisting at Caldwell's request. It was Caldwell, not Covington, who signed the perjury statement and it was Caldwell, not Covington, who was responsible for the accuracy of the documents.

Caldwell further defends by arguing that not only were the omissions a mistake and inadvertent, they were not material, no one relied upon the omissions and no one was damaged by the omission. In *Friedman v. Alfonso (In re Alfonso)*, 94 B.R. 777, 778

---

**17.** Mr. Covington is a geologist, an officer of Hiko Bell and friend of Caldwell. He assisted Caldwell in preparing the lists from which the Chapter 13 and Chapter 12 statement were prepared.

**18.** Caldwell cannot rely upon the mistakes, inadvertence or advice of counsel to excuse inaccuracies in the schedules. *In re Adeeb,* 787 F.2d at 1343. As recited in *In re Hubbard,* 96 B.R. at 750:

When practitioners become too busy to give each case the attention it deserves, when par-

ticipants in the process become too adversarial, the Court is forced, as in this case, to attempt to restore balance. All of these competing interests are generally satisfied by full and complete disclosure.

. . . .

It is not allowable for a Debtor to pick and choose the information to be given on answers to these forms. All claims, as defined in Bankruptcy Code § 101(4), must be disclosed.

(Bankr.S.D.Fla.1988) the court indicated that:

> Materiality of the false oath does not require that the creditors be prejudiced by the omission or false statement; instead, materiality depends on whether the false oath was pertinent to the discovery of assets, business dealings or past transactions. [Citations omitted]. In failing to disclose the debtor's past business dealings and assets in his schedules, the creditors were hindered from discovering a past transaction to which they might have objected.

In the instant case, the transactions between Caldwell and his son, whether constituting a contract receivable or a transfer of an asset by settlement, are material transactions to which parties in interest are entitled to have full and complete disclosure.

> While the omission of one or two relatively small or immaterial matters would not affect the ability to obtain a discharge, it is this court's determination that the extent and volume of the omissions as well as the importance of the information omitted is sufficient to substantiate the denial of discharge under 11 U.S.C. § 727(a)(4)(A).

*In re Alfonso,* 94 B.R. at 778.

The asset listing on the Chapter 13 Statement differs substantially from that set forth in the Chapter 12 statement. From an examination of the document submitted into evidence it appears that the difference between the equipment listing on the Chapter 13 Statement and the Chapter 12 statement was accomplished merely by placing a blank piece of paper over certain listed items and photocopying the total document. The photocopy then became a portion of the Chapter 12 statement filed with the court. The value of the items listed on the copy was, accordingly, reduced from $96,700 on the Chapter 13 Statement to $77,200 [19] on the Chapter 12 statement. The court finds the alteration of this document not merely a clerical mistake resulting from the omission of a page as explained by Caldwell and Famulary. The omission of those items required a conscious effort to conceal them.

Further, the Chapter 12 statement omitted substantial additional assets owned by Caldwell. The circumstances of the discovery of the omission are telling. UPCA appeared at the section 341 meeting and subsequent Rule 2004 examination and inquired regarding assets missing from the Chapter 12 statement. During the examination Caldwell wrote down from his recollection a list of the assets that were omitted from the Chapter 12 statement and eventually filed an amendment to reflect that information. The amendment however, was not filed until almost a month later—one business day prior to this hearing. UPCA argues that, but for its original motion, the Chapter 12 statement would not have been filed. Further, UPCA asserts that, but for its investigation and insistence, the amendments would not have been filed at all, and that the assets omitted were those Caldwell considered to be free and clear.

The Chapter 12 amendment sets forth with much more specificity Caldwell's assets and it is clear to the court that more care has been taken with this document. The total assets on the Chapter 12 amendment has risen to $716,295 [20] from the $370,323 originally listed on the Chapter 12 statement. It is impossible to find this difference immaterial. Even with the amendment however, the listing remains incomplete.

The Chapter 13 Statement lists a $45,000 promissory note receivable from Jay R. Kirk and Lawrence C. Caldwell, II. This asset is not included in the Chapter 12 statement. Neither does the Chapter 12 amendment list the promissory note owed to Caldwell from Jay R. Kirk and Lawrence C. Caldwell, II in the amount of $45,000, or in the amount of $29,000 as set forth in the settlement agreement or, in the alternative,

---

**19.** Addition of the amounts on page 19–B of Exhibit "A" indicates a $10,000 discrepancy in the total.

**20.** Addition of the amounts on page four of Exhibit "B" indicates a $20 discrepancy in the total.

the $2,500 provided in the settlement agreement.

Caldwell has also failed to amend the statement to include Powell as a creditor and the circumstances of that litigation. The amount claimed by Powell, though unliquidated and contingent, is significant and materially impacts the return to other unsecured creditors.

The court finds from the evidence presented and the demeanor of the witnesses that the omission of assets and liabilities from the Chapter 12 statement was intentional. The court further finds that there is no excuse which Caldwell or counsel has advanced which justifies the omission of such substantial assets as those originally omitted from the Chapter 12 statement; especially since a portion of the information was already included in the draft of the Chapter 13 Statement. Further, the failure to amend to accurately list all assets and liabilities evidences a continued pattern of intentional concealment.

### 3. Reliance and Damages in the Context of a Chapter 12

■ Caldwell argues that reliance and damages must be proven by UPCA before the court can find fraud under section 1208(d). UPCA has failed to prove that it relied in any manner on the misrepresentations in the schedules. To the contrary, past dealings have given UPCA a substantial skepticism of Caldwell's representations. UPCA has failed to show any specific damage other than incurring attorneys fees for these actions and the delay in receiving payment or collateral resulting from the filing.

The court determines however, that specific reliance and damage to the moving party is not a prerequisite to section 1208(d). The damage section 1208(d) attempts to proscribe is not limited to damage to a specific creditor, but also encompasses damage to the bankruptcy process. The damage in this case is the inability of the court, the Standing Trustee and the creditors to rely upon the accuracy of Caldwell's schedules. *Job v. Calder (In re Calder)*, 93 B.R. 734, 737 (Bankr.D.Utah 1988). Creditors must have reliable information to use in assessing their course of conduct to protect their rights in this reorganization. A showing of specific reliance and damage is not necessary under these circumstances any more than it would be required under section 727(a)(4). *Strunk*, 671 F.2d at 396. Indeed, the unique circumstances of a chapter 12 case argue for even greater disclosure than in a chapter 7 case.

In the usual context of a section 727(a)(4) action, the requirement of full disclosure assists the trustee in bringing actions under sections 547 and 548 to return assets to the estate for distribution to creditors. Full disclosure provides information upon which creditors and the trustee may build a case. *In re Calder* 93 B.R. at 738.[21] The rights of the parties are fixed at the time of filing and any subsequent amendment may have little future adverse effect on parties in interest.

In a chapter 12 case, full disclosure plays a significantly expanded role. The purpose of a chapter 12 filing is to propose and confirm a plan of reorganization in which up to $1,500,000[22] in debt may be restructured. This debt ceiling is significantly higher than that allowed in chapter 13. Commensurate with the increased debt ceiling is an increased level of responsibility on the part of the debtor to accurately inform its creditors of its financial condition.

In addition, a chapter 12 plan often restructures a markedly more complicated financial situation than a consumer chapter 13. In a chapter 12, large tracts of real property may be involved, assets may be cross-collateralized and the financing arrangements often reflect the cyclical nature of farming by pledging security interests in crops and property not yet in exist-

---

**21.** *In re Calder* contains a thorough discussion of the necessity of a chapter 7 debtor to file accurate and truthful statements and schedules evidencing full disclosure of the debtor's finan- cial affairs as a prerequisite to obtaining a discharge.

**22.** Section 101(17).

ence. A chapter 13 however, usually restructures relatively simple consumer debt without the complexities of a large cash-intensive agricultural endeavor.

The chapter 12 debtor is given wide berth to produce and effectuate a feasible plan with no court approved disclosure statement. All of this occurs and is premised upon the totality of information solely in the control of the debtor and communicated to creditors only through the asset and liability listings placed of record by the debtor. No court approved disclosure statement is distributed to creditors, nor is there a creditors' committee appointed as in a chapter 11. It is mandatory that the debtor fully and timely disclose all financial information so that creditors can make informed judgments regarding the plan.

Caldwell's plan has been circulated to creditors and will be voted upon with only the information available in the Chapter 12 statement and Chapter 12 amendment to guide parties in interest. Caldwell's plan provided the following treatment for unsecured creditors:

> *Class F.* The holders of the allowed unsecured claims shall be paid through the plan after the administrative claims, priority claims and secured claims have been paid. It is anticipated that the claims will be satisfied within five years after confirmation of the plan, if the Powell claim is disallowed. Any claims in Class F remaining after five years after the effective date shall be discharged pursuant to the provisions of Bankruptcy Code Section 1228.

The "Powell" claim is not even listed in the Chapter 12 statement. How, then, can unsecured creditors who are not allowed to vote on a plan, or the court, begin to determine if this treatment is appropriate if no information regarding the claim is available to them? The Standing Trustee is expect-

ed to investigate and to appear and be heard in reliance upon the documentation produced by Caldwell. Creditors and the Standing Trustee must determine whether grounds exist for an objection to confirmation[23] based in large part on the documentation on file with the court. The court is expected to rule upon good faith, feasibility, liquidation value, and other aspects of confirmation from evidence presented by parties in interest relying upon this information.

Excuses simply will not be given credence when Caldwell's course of dealing in connection with the case shows an intentional and consistent attempt to mislead creditors to their detriment. Indeed, the failure to provide accurate information in a chapter 12 case could be construed as an attempt to fraudulently obtain confirmation of a plan.[24]

## CONCLUSION

Even if the draft Chapter 13 Statement was not in evidence and the court believed the omission of the assets was unintentional, the failure to amend promptly[25] once the omission was discovered is an indicia of fraudulent intent. Reviewing section 727(a)(4)(A), the court in *In re Alfonso* stated, "Moreover even though schedules are filed in haste, a debtor's failure to promptly amend the schedules is considered a reckless indifference to the truth which is the equivalent of fraud." *In re Alfonso*, 94 B.R. at 778.

The statute mandates full, complete and prompt disclosure so that parties in interest may effectively protect their rights, and so that the Standing Trustee can accurately administer the assets of the estate. *In re Hubbard*, 96 B.R. at 751. The court must make a judgment based upon fact, not upon a mere hope that the information contained in the debtor's schedules is suffi-

23. Section 1225(b)(1).

24. If fraudulent activity results in confirmation of a plan and eventual discharge of debt, an action may be available under section 1228(d).

25. Bankruptcy Rule 1007(h) sets a 10 day limit on the filing of a supplemental schedule to in-

clude interests in property acquired by the debtor or arising after the petition. The triggering date for the ten day limit is when the information comes to the debtor's knowledge. It is consistent that other undisclosed assets be revealed to creditors in as prompt a manner once brought to the debtor's attention.

ciently accurate to adjudicate the rights of parties in interest.

If the court adopted Caldwell's argument that amendments can be made up until confirmation,[26] even though the information is known to be inaccurate long before, the obligations of the Code would run only one way. Creditors would be required to file accurate, timely and complete proofs of claim and to precisely plead stay lifts and motions. This level of accuracy would not be required of the debtor. According to Caldwell, the debtor could play his cards close to the vest. He could execute perjury statements without having read the documents. He could file erroneous and misleading information in haste and excuse the conduct because of the inability of counsel to monitor the data. The debtor could then amend at his leisure at any point in time, even though the debtor knows of the inaccuracies and has reasonable cause to know creditors are relying on the misinformation. This cavalier attitude towards the court and the requirements of the Code cannot be tolerated.

Caldwell's course of conduct in executing a perjury statement which materially misstated the assets and liabilities of the estate, coupled with his failure once the omissions were discovered to promptly and accurately amend are all, in light of the magnitude of the assets and liabilities omitted, indicia of Caldwell's intent to defraud this court and creditors. Such actions affect the proper administration of the estate and the ability of creditors to protect their rights and vote on the plan of reorganization. The fraud evidenced by this filing is, in this court's view, precisely the course of conduct Congress intended to eliminate when it enacted the very unusual provision of section 1208(d).

The Motion before the court is for conversion to chapter 7. That is a harsh result for Caldwell who may be solvent. The court is aware that its ruling may provide a basis for future proceedings in this chapter 7 case. However, all those consequences were foreseeable to Caldwell and his attorneys. Absent Caldwell's election under section 1208(b) to dismiss the case, he must now suffer the consequences of his actions.

Counsel for UPCA is directed to prepare an order referencing this Memorandum Decision converting the case to a case under chapter 7.

---

26. Caldwell argues that even if the asset and liability lists were inaccurate initially, or are still incomplete, Bankruptcy Rule 1009 allows amendments to the schedules at any time as a matter of course. Caldwell asserts that the opportunity to amend should be extended up to a point at which, if the court made a ruling from inaccurate information contained in the Chapter 12 statement, parties in interest would be jeopardized. That point is argued by Caldwell to be up until the time the court rules upon confirmation of Caldwell's plan.

Caldwell's argument in the context of this chapter 12 case is incorrect. The court acknowledges that it is sometimes difficult to accurately list all the assets and liabilities of a debtor in the detail required by the statute and that generally, amendments to those documents are freely allowed as an aid to full disclosure. Caldwell however, is clearly imposing upon that general principle. Amendments should be allowed only if there is no showing of bad faith or prejudice to creditors. *Stinson v. Williamson (In the Matter of Williamson)* 804 F.2d 1355, 1358 (5th Cir.1986).

## EXHIBIT "A" -- CHAPTER 12 STATEMENT

CRAIG CALDWELL
LIST OF EQUIPMENT
NOVEMBER 30, 1988

VEHICLES & EQUIPMENT, CAT CREEK RANCH:

UINTAH COUNTY, UTAH:

| | | |
|---|---|---|
| Van, Chevrolet, 1984    Mtg., Zions, $5,600 | | $ 7,500 |
| Gin Truck, 1980, 4x4, 1 ton, with gin poles | No Mtg. Value | 4,000 |
| Farm truck, dump type, with rack, 1 ton, 1979 | Value | 4,000 |

TOTAL VALUE VEHICLES, THIS LIST:                                   $15,000

SERVICE TRAILERS:

| | | |
|---|---|---|
| 1982 Special Fifth Wheel Trailer | No Mtg. Value | $ 3,500 |
| 1981 Flatbed Trailer with tilt bed | No Mtg. Value | 4,500 |
| 1977 American Trailer, stock trailer | No Mtg. Value | 15,000 |
| 1977 Horse trailer, 4 horse carrier | Value | 2,000 |
| | | $25,000 |

TOTAL VEHICLES:        $15,500

TOTAL TRAILERS:        25,000
TOTAL VALUE:           $40,500

NOTE:  ALL EQUIPMENT LOCATED ON RANCH.  NO CO-OWNER.  NO MORTGAGES.

PAGE 19-A

LIST OF FARM ASSETS OF CRAIG CALDWELL

DBA CAT CREEK RANCH
P.O. BOX 501
VERNAL, UTAH 84708

| PROPERTY DESCRIPTION | NAME OF SECURED CREDITOR, IF ANY | AMT. OF MORTGAGE | PRESENT MARKET VAL. |
|---|---|---|---|
| House, frame, & 1.2 ac. 2 bedroom, 1 bath | Utah Prod. Credit Association | S65,204 | $12,000 |
| Land, 31 acres, pasture valued at S700/ac. | Utah PCA | | 21,000 |
| Barn, Metal, 36 x 48' | Utah PCA | | 10,000 |
| Misc. Bldgs. | Utah PCA | | 2,000 |
| Farm Equipment: | | | |
| 1 Holland Baler | Utah PCA | | 3,500 |
| 1 Hesston Swather | Utah PCA | | 15,000 |
| 1 Hesston Hay Loader | Utah PCA | | 5,000 |
| 1 Manure Spreader | Utah PCA | | 1,000 |
| Farm Animals: | | | |
| Bulls, 2, Simental | Utah PCA | | 2,400 |
| Bulls, 1 Hereford | Utah PCA | | 1,500 |
| Horses, 5 working saddle horses | Utah PCA | | 2,500 |
| Horses, 3 Brood Mares | Utah PCA | | 600 |
| Horses, 1 Pack Horse | Utah PCA | | 200 |
| Horses, 3 colts & ponies | Utah PCA | | 1,000 |
| 32 Purebred Ewes, Suffolk, | Utah PCA | | 5,000 |
| 20 Purebred Buck Lambs | Utah PCA | | 3,000 |
| 15 Purebred Suffolk Ewe Lambs | Utah PCA | | 1,500 |

TOTAL VALUE, FARM EQUIPMENT & LIVESTOCK:
(INCLUDING HOUSE, BARN & LAND)                    $77,200

PAGE 19-B

## EXHIBIT "B" -- CHAPTER 12 AMENDMENT

AMENDED
LIST OF FARM ASSETS OF CRAIG CALDWELL
DBA CAT CREEK RANCH
MORTGAGED TO:
PRODUCTION CREDIT ASSOCIATION

3-30-89

| PROPERTY DESCRIPTION | NAME OF SECURED CREDITOR, IF ANY | AMT. OF MORTGAGE, IF ANY | ESTIMATED VALUE, DOLLARS |
|---|---|---|---|
| New Holland Baler, #315, 1978 | Utah PCA on all equipment this list | $65,204 Total, This List | $ 3,500 |
| Hesston Swather, 1978 #6600 | | | 12,000 |
| New Holland Bale Wagon, 1978, #1032 | | | 5,500 |
| House, Frame, White, 3 bedroom, 1 bath on .76 acres | | | 12,000 ** |
| Land, 25.00 ac, pasture, value: $620/acre | | | 15,500 ** |
| Barn, metal, 38 x 48 with concrete floor | | | 10,000 ** |

LIVESTOCK:

| | | |
|---|---|---|
| Bulls, 2 Simental @ $1,500 ea. | | 3,000 **** |
| Cows, 4, 3 with calves, | | 3,200 |
| Bulls, 1, Hereford | | 1,200 |
| Horses, 5 working saddle horses | | 2,500 |
| Horses, 3 brood mares @ $200 ea. | | 600 |
| Pigs, 3 sows @ $50 ea. & 21 weiners @ $25 ea. | | 675 |
| Ewes, Purebred Suffolks, 32 @ $150 ea. | | 4,800 |
| Lambs, 18 Purebred Suffolk buck lambs, yearlings | | 3,000 |
| Lambs, 15 Purebred Suffolk ewe lambs | | 1,500 |
| TOTAL THIS LIST: | | $78,975 |

** Estimated. Certified appraisal to correct will follow shortly.
**** These two bulls were sold for $1,500 and the money was put into the Trust account of Anthony J. Famulary.

- PAGE ONE OF TWO PAGES -

AMENDED LIST OF FARM ASSETS OF CRAIG CALDWELL
MORTGAGED TO PRODUCTION CREDIT ASSOCIATION
MARCH 30, 1989
PAGE TWO

LIVESTOCK, CONTD.:                                          EST. VALUE

Geese, 21. Have never been able to sell or give anyone a goose.        None
Ducks, 10. Have never found anyone wanting to buy a duck.              None
Chickens, 10. , @ $2.00 ea.                                           S   20

         TOTAL VALUE LIVESTOCK THIS PAGE:                         S   20

HAY

Hay on hand this date: None. Used for feeding 1st Quarter.             -0-

         TOTAL VALUE OF MORTGAGED REAL PROPERTY, THIS PAGE:       S   20

RECAPITULATION OF REAL PROPERTY MORTGAGED TO PCA

Equipment, house, land, incl.old wood granery:              $58,500

Livestock:  Page One              $20,475
            Page Two                  20
                                  $20,495                   $20,495

TOTAL, PAGES ONE & TWO:                                     $78,995

## A M E N D E D

### ADDITIONAL LIST OF OTHER PROPERTY NOT MORTGAGED TO PCA

CRAIG CALDWELL
DBA CAT CREEK RANCH
3-30-1989
(ALL EQUIPMENT FREE & CLEAR OF LIENS UNLESS NOTED) **

| FARM EQUIPMENT: | ESTIMATED VALUE |
|---|---|
| Manure spreader, 3 fork | $ 1,000 |
| Tractor, Ford, #4000, 50HP, Diesel, #34014 | 3,000 |
| Tractor, Ford, 40 HP, Diesel, #3400 | 3,000 |
| Miscellaneous Farm Equipment, plows, rakes, etc. including miscellaneous tools | 500 |
| Harrow, springtooth, 10' | 100 |
| Calf Chute, Powder River make | 300 |
| Harrow, spiketooth, 3 sections | 200 |
| Panels, assorted, 17 | 500 |
| Gates, 2, steel | 250 |
| Gates, 2, runway gate type | 100 |
| Manhandler, 1, with sheep chute & scales | 400 |
| Feeders, lamb type, creep feeders, 2 | 400 |
| Plow, 3 bottom Ford | 150 |
| Leveler, 1 Three point | 200 |
| Chute, portable loading type | 300 |
| TOTAL EQUIPMENT, THIS PAGE: | $10,400 |

PAGE ONE

AMENDED LIST OF OTHER PROPERTY NOT MORTGAGED TO PCA
CRAIG CALDWELL
MARCH 30, 1989
PAGE TWO

VEHICLES:

| | |
|---|---|
| Van, Chev., Custom, 1982, #1GBEG25H67127704 | 6,000 ($6,500 Mtg., Zions) |
| Truck, Chev., Gin Truck, 1980, 4 x 4 w/gin poles,<br>    w/winch, oil field construction equipped | 4,500 |
| Truck, Pickup, GMC, 1968, w/camper, 4 x 4, #KE20D-<br>    PB64694 | 4,000 |
| Truck, Pickup, Ford, 1979, #f26SRDH1018 | 500 |
| Truck, Pickup, GMC, Red, w/oil field equipment<br>    fuel tanks, #TCE242J508358 | 500 |
| Truck, Dump type, Farm, 1979 Chev. 1-ton, 4 x 4 w/rack | 3,500 |
| Truck, Pickup, 1982, Chev., Diesel, Brown, 4 x 4,<br>    No. 1GCEK14C5CJ114875 | 3,500 |
| Truck, Pickup, Brown, Diesel, 4 x 4, #IGCEK14C9EJ26868 | 6,500 |
| Bellydump, Beale, 1972, #DHS3082721 | 5,000 |

TRAILERS, OIL FIELD FLATBED & LIVESTOCK TYPES:

| | |
|---|---|
| Fifth wheel flat bed, Special, 1982, #253468 | 3,500 |
| Flatbed, tilt bed, 1982, #05371 | 4,500 |
| Horse trailer, 4 horse type, #050103 | 800 |
| Livestock trailer, AMEM, #AV189239 | 16,000 |

** Except for Internal Revenue Service

TOTAL THIS LIST: $58,800
(6,500) OWED ZIONS
$52,300  TOTAL EST. VALUE,,THIS
PAGE

AMENDED LIST OF OTHER PROPERTY NOT MORTGAGED TO PCA
MARCH 30, 1989
PAGE THREE

MISCELLANEOUS OIL FIELD & CONSTRUCTION EQUIPMENT:

|  | EST. VALUE |
|---|---|
| Backhoe, Case, Model 580-C | $ 7,500 |
| Trailer, House type, Nomad, 28', self contained, #707772102 | 5,000 |

STOCKS:

| | |
|---|---|
| Hiko Bell Mining & Oil Company, an OTC Company.<br>4,413,848 shares, value: 3-30-89: 1¢ Bid | 44,138 |
| Ashley Central Irrigation Co. "S" Stock, 45 sh. @ $31/sh. | 2,395 |
| Ashley Upper Primary Stock, 1.23 sh. @ $3,00/sh. | 4,065 |
| Ashley Valley Reservoir Stock, 40 sh. @ $50/sh. | 2,000 |
| Ashley Central Irrigation Co., 4 sh. @ $6,000/sh. | 24,000 |

ADDITIONAL PROPERTY:

| | |
|---|---|
| 3 Wheeler, ATV, Model 200, Honda, #TB 05E-2123624 | 100 |
| Snowmobile, Yamaha, 1982, Model SR54OF, #8R6-031884 | 100 |
| Snowmobile, Yamaha, 1982, Model SR54OF, #8R6-031840 | 100 |
| Motorcycle, Yamaha, 1983, Model RSm #Jya27y000DA002720 | 750 |
| Boat, Fibrform, 18', 150 HP, #UTZ1537SA966 w/trailer | 2,500 |
| Gun, Shotgun, 12 gauge | 100 |
| Personal effects, miscellaneous | 300 |
| Furniture & household goods | 1,500 |
| | $94,548 |

REAL ESTATE:

| | |
|---|---|
| House, 250 No. 1100 West, Vernal, Utah<br>Brick, 3 level, 2/2 car garage, 7 lots,<br>50% interest | 130,000 ** |
| Land, 6.46 ac., water storage reservoir site,<br>Location: SE¼SE¼ Sec. 7, T5S-R22E @ $300/ac. | 1,938 ** |
| House, brick & wood, white, 1305 West Main, Vernal.  Value:<br>$31,000 est  Owe approx. $24,000 to American Savings,<br>Salt Lake City, Equity is approximately $7,000. | 7,000 ** |
| TOTAL: | $233,486 THIS PAGE |

** Estimated.  Certified Appraisal to follow shortly.

AMENDED ASSET LIST
CRAIG CALDWELL
ASSETS NOT MORTGAGED TO PCA
MARCH 30, 1989
PAGE FOUR

ACCOUNTS RECEIVABLE:

Hiko Bell Mining & Oil Company, a Utah Corporation.
A 10-K S.E.C. reporting company.  Founded 1943.
Listed Over the Counter in Pink Sheets.  Has over
12,000 stockholders.  Cleared to trade in every state
except California.

| | |
|---|---:|
| Salary due as of 12-31-87 | $264,315 |
| 1988 Salary | 32,500 |
| Notes due from Hiko Bell: | 68,799 |
| Due Hiko Bell, Notes | (24,480) |
| TOTAL DUE CRAIG CALDWELL: | $341,134 |

RECAPITULATION OF ASSETS

| | | | |
|---|---|---|---:|
| I. | AMENDED LIST OF PROPERTY MORTGAGED TO PCA" (PAGES 1 & 2) | | $78,995 |
| II. | AMENDED LIST OF FARM EQUIPMENT NOT MORTGAGED: (PAGE ONE) | | 10,400 |
| III. | AMENDED LIST OF VEHICLES & TRAILERS: (PAGE TWO) | | 52,300 |
| IV. | MISCELLANEOUS OIL FIELD CONSTRUCTION EQUIPMENT, STOCKS, MISC. PROPERTY & REAL ESTATE (PAGE THREE) | | 233,486 |
| V. | ACCOUNTS RECEIVABLE, (PAGE FOUR) | | 341,134 |
| | TOTAL ASSETS: | | $716,295 |

## EXHIBIT "C" -- CHAPTER 13 STATEMENT

LIST OF FARM ASSETS OF CRAIG CALDWELL

DBA CAT CREEK RANCH
P. O. BOX 501
VERNAL, UTAH 84078

| PROPERTY DESCRIPTION | NAME OF SECURED CREDITOR, IF ANY | AMT. OF MORTGAGE | PRESENT MARKET VAL. |
|---|---|---|---|
| House, frame, & 1.2 ac. 2 bedroom, 1 bath | Utah Prod. Credit Association | $65,204 | $12,000 |
| Land, 31 acres, pasture valued at $700 /ac. | Utah PCA | | 21,000 |
| Barn, Metal, 36 x 48' | Utah PCA | | 10,000 |
| Misc. Bldgs. | Utah PCA | | 2,000 |
| Farm Equipment: | | | |
| 1 Holland Baler | Utah PCA | | 3,500 |
| 1 Hesston Swather | Utah PCA | | 15,000 |
| 1 Hesston Hay Loader | Utah PCA | | 5,000 |
| 1 Manure Spreader | Utah PCA | | 1,000 |
| Mobile gates & fences | Utah PCA | | 5,000 |
| Miscellaneous Equipment | Utah PCA | | 5,000 |
| Sheep Squeeze Chute | Utah PCA | | 3,000 |
| Cow Squeeze Chute | Utah PCA | | 4,000 |
| Feeding Tanks & Troughs | Utah PCA | | 2,000 |
| Tractor, Ford, 1965 Diesel | Utah PCA | | 500 |
| Farm Animals: | | | |
| Bulls, 2, Simental | Utah PCA | | 2,400 |
| Bulls, 1 Hereford | Utah PCA | | 1,500 |
| Horses, 5 working saddle horses | Utah PCA | | 2,500 |
| Horses, 3 Brood Mares | Utah PCA | | 600 |
| Horses, 1 Pack Horse | Utah PCA | | 200 |
| Horses, 3 colts & ponies | Utah PCA | | 1,000 |
| 32 Purebred Ewes, Suffolk | Utah PCA | | 5,000 |
| 20 Purebred Buck Lambs | Utah PCA | | 3,000 |
| 15 Pueebred Suffolk Ewe Lambs | Utah PCA | | 1,500 |

TOTAL VALUE, FARM EQUIPMENT & LIVESTOCK:
(INCLUDING HOUSE, BARN & LAND) $96,700

CRAIG CALDWELL
LIST OF EQUIPMENT
NOVEMBER 30, 1988

VEHICLES & EQUIPMENT, CAT CREEK RANCH:

UINTAH COUNTY, UTAH:

| | | |
|---|---|---|
| Van, Chevrolet, 1984 | Mtg., Zions, $5,600 | $ 7,500 |
| Gin Truck, 1980, 4x4, 1 ton, with gin poles | No Mtg. Value | 4,000 |
| Farm truck, dump type, with rack, 1 ton, 1979 | Value | 4,000 |
| TOTAL VALUE VEHICLES, THIS LIST: | | $15,500 |

SERVICE TRAILERS:

| | | |
|---|---|---|
| 1982 Special Fifth Wheel Trailer | No Mtg. Value | $ 3,500 |
| 1982 Flatbed Trailer with tilt bed | No Mtg. Value | 4,500 |
| 1977 American Trailer, stock trailer | No Mtg. Value | 15,000 |
| 1977 Horse trailer, 4 horse carrier | Value | 2,000 |
| | | $25,000 |

| | |
|---|---|
| TOTAL VEHICLES: | $15,500 |
| TOTAL TRAILERS: | 25,000 |
| TOTAL VALUE: | $40,500 |

L. CRAIG CALDWELL
STATEMENT OF FINANCIAL CONDITION
(DBA CAT CREEK RANCH)

December 1, 1988

ASSETS

| | |
|---|---:|
| Cash | $ 345 |
| Marketable Securities | |
|     4,413,848 AT .01/share, Hiko Bell Mining & Oil | 44,138 |
|     Water shares, irrigation water | 10,000 |
| Notes Receivable: | |
|     Promissory Note, Jay R. Kirk & Lawrence C. Caldwell, II | 45,000 |
| Vehicles & Equipment (see accompanying list) | 136,040 |
| Livestock (see attached list) | 16,200 |
| Real Estate: | |
|     Home, 1305 West Main, Vernal, Utah | 40,000 |
|     Ranch, 1027 S.1500 E., Vernal, Utah, 30 ac @ $700/AC. & | |
|                                            Steel Barn | 31,000 |
|     Ranch House & 1.0 ac,, 1027 S.1500 E. | 12,000 |
|     House, 250 N.1100 West, 50% interest | 110,000 |
|         TOTAL ASSETS: | $423,033 |

LIABILITIES

| | |
|---|---:|
| Mortgage, House, 1305 W.Main, Vernal, Utah | 28,000 |
| Crofts Oil & Ashton Bros. Bill | 4,606 |
| Loan, Production Credit Assn., Livestock,Ranch & Eqpt. | 65,204 |
| Vernal City, Special Improvement Taxes | 12,000 |
| Income Tax payable | 93,503 |
|         TOTAL LIABILITIES: | $203,313 |

EQUITY

| | |
|---|---:|
| Net Worth-L. Craig Caldwell (DBA Cat Creek Ranch) | $219,720 |
|     Total Liabilities and Equity | $423,033 |